NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

NOS. 4-22-0632, 4-22-0633 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 20, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* I.H. and J.H., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Tazewell County |
| (The People of the State of Illinois, | ) | Nos. 19JA3 |
| Petitioner-Appellee | ) | 19JA4 |
| | ) | |
| v. | ) | |
| | ) | Honorable |
| William H., | ) | David A. Brown, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Harris and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Appellate counsel's motion to withdraw was granted, as there were no meritorious issues concerning the trial court's finding of unfitness and termination of respondent's parental rights.

¶ 2    Respondent William H. is the father of the two minors involved in this consolidated appeal, I.H. and J.H. After the minors spent approximately three years in substitute care, the State filed petitions seeking to terminate respondent's parental rights. The trial court granted the State's petitions. The parental rights of both respondent and the mother of the children were terminated. The minors' mother is not a party to this appeal.

¶ 3    On appeal, appellate counsel has filed a motion to withdraw his representation of respondent pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing that respondent's appeal

presents no potentially meritorious issues for review. We grant counsel's motion and affirm the judgment of the trial court.

¶4                                    I. BACKGROUND

¶ 5        The record establishes that on January 4, 2019, the Illinois Department of Children and Family Services (DCFS) placed the minors in substitute care. On January 7, 2019, DCFS filed a shelter care petition alleging that the minors were neglected by means of an injurious environment and that it was in their best interests to be placed in shelter care (705 ILCS 405/2-3(1)(b) (West 2018)). The petition alleged that on October 24, 2018, respondent struck the minors' mother while she was pregnant and did so in the presence of I.H. Respondent was charged with domestic battery and the minors' mother obtained an order of protection against respondent. A "hitter" pipe was found on respondent during the custodial search accompanying his arrest. On a subsequent occasion, police responded to the residence after respondent struck his mother several times in the presence of both minors during an argument about respondent's drug addiction. Respondent had fled the residence before police arrived. The following day, police and DCFS went to the residence to conduct a well-being check and to locate respondent. The minors' mother told police that no one else was in the residence, but police found respondent hiding in a closet. The minors' mother told police that there was a history of domestic violence between her and respondent, but that she had allowed the respondent to return to living with her and intended to drop the order of protection. Finally, the petition alleged that DCFS found that the allegations against respondent were "indicated" for substantial risk of physical injury based upon the incident involving the minors on October 24, 2018.

¶ 6        Following a hearing, the petition was granted and the trial court ordered that DCFS place the minors with appropriate caregivers. Respondent was advised in writing that his parental

rights could be terminated if he did not cooperate with DCFS or failed to comply with the service plan and correct the conditions that required the minors to be placed in care. On February 1, 2019, respondent stipulated to the allegations in the petition.

¶ 7    An integrated assessment dated March 26, 2019, notes that respondent was cooperating with toxicology screens and had been referred for domestic violence services and parenting education. Respondent was undergoing a substance abuse assessment and told DCFS that he had been prescribed medication for an opioid addiction, but he denied using any illegal substances. Respondent was also to visit the minors.

¶ 8    A service plan dated July 23, 2019, specified that respondent was required to cooperate with DCFS, sign all release forms, and stay in contact with the assigned caseworker from Children's Home Association Foster Care (Children's Home). Respondent's progress was rated unsatisfactory because, although he had signed all releases, he had not stayed in contact with the caseworker. Respondent also was to complete a parenting course and was rated unsatisfactory because he had not started that course. Respondent was to complete a drug assessment and to complete two drug and alcohol "drops" per month. Respondent's progress was again rated unsatisfactory as of June 2019 because he had not completed the drug assessment and had completed only one drop in February 2019, which was negative. Respondent was to complete a domestic violence course, but his progress was rated unsatisfactory because he had failed to do so. Respondent was to participate in counseling but was rated unsatisfactory because he had not yet contacted the therapist. Respondent was to obtain and maintain a stable source of income and housing, but his progress was rated unsatisfactory because it was unknown if he had done so due to his failure to stay in contact with the assigned caseworker.

¶ 9         Additional information is found in a "Dispositional Hearing (Social History)" report prepared by Children's Home on September 25, 2019. The report states that respondent's whereabouts were currently unknown and that he was last seen when he appeared in court on September 13, 2019. Respondent was unemployed and had no identifiable source of income. He failed to attend the scheduled monthly meetings with his caseworker. Respondent had been arrested and charged with multiple offenses after this case was initiated. These included being charged with violating an order of protection and criminal trespass on February 11, 2019; domestic battery/bodily harm against the minors' mother on March 3, 2019; and armed robbery and possession of a controlled substance on April 5, 2019. Regarding his referral for counseling, respondent was assigned a therapist and scheduled for weekly meetings. However, respondent was discharged from therapy after the therapist's unsuccessful attempts to reach him. Similarly, respondent did not respond to multiple attempts by a therapist to contact him and arrange for domestic violence and parenting classes. Respondent was inconsistent in attending his weekly supervised visits with the minors, and he last attended a visit on April 23, 2019.

¶ 10        Following a hearing on October 24, 2019, the trial court entered an adjudicatory order finding that the allegations in the petition had been proven by a preponderance of the evidence and that the abuse or neglect was inflicted by both parents. The court entered a dispositional order on the same day. The court found that respondent was unfit due to drug abuse, domestic violence, and the dispositional report. The court also found that reasonable efforts and appropriate services aimed at family reunification could not prevent the necessity of the minors being removed from the home. The court made the minors wards of the court and appointed DCFS as guardian with the right to place the minors. Respondent was granted supervised visitation with the minors. The court set a permanency goal for the minors of a return home within 12 months.

¶ 11        The same day, the trial court also entered a Supplemental Task Order with respect to respondent. That order required respondent to cooperate with DCFS, sign any necessary releases, obtain and maintain stable housing, and notify the assigned DCFS caseworker of any change in address, employment, or members of the household. Respondent was also ordered to visit the minors in accordance with a schedule set by DCFS and to provide the DCFS caseworker with the contact information of anyone with whom a relationship affecting the minors exists or will develop. Finally, the court ordered that respondent complete the following: a psychological exam, substance abuse assessment, parenting classes, counseling and domestic violence classes, and random alcohol and drug testing at least three times per month.

¶ 12        The State filed a petition for termination of parental rights in each case on January 12, 2021. The petitions alleged that respondent was unfit for failure to make reasonable progress toward the return home of the minors within nine months of the adjudication of neglect. The case was set for first appearances on the State's petitions on January 31, 2022. Respondent had not been successfully served at the addresses provided, and he was not present at that hearing. The caseworker related that respondent called and left her a voicemail on the previous Thursday, but respondent did not answer when she returned his call the following day and his phone did not have voicemail. The next hearing on the State's petitions was held on March 17, 2022. Respondent failed to attend the hearing and was defaulted.

¶ 13        On May 9, 2022, best interest reports were filed with respect to the minors. Those reports indicated that the minors had been in foster care for 1212 days and that the foster parents were willing to adopt them. The minors had a strong bond with the foster parents, and theirs was the only home the minors had resided at since January 4, 2019. The foster parents provided for the minors' needs and their home had passed inspection and was deemed safe. The minors did not

have a bond with respondent. The reports concluded that the minors needed permanency in their lives and had a sense of security and familiarity in the foster home. Both minors suffered from various and significant medical issues.

¶ 14 Updated best interest reports were filed on May 10, 2022. Those reports indicated that respondent failed to participate in any of the services ordered by the trial court. Respondent had not attended any of the minors' medical appointments since the case was opened due to his lack of involvement in the case and his incarceration. Respondent did not make inquiries into the minors' health and there was concern that respondent did not understand the minors' significant medical needs. Respondent remained unemployed during the duration of the case and his current source of income was unknown due to his lack of contact with the caseworker. Since the case was opened, respondent had been unable to provide for the basic needs of the minors, including food, shelter, and clothing. Respondent failed to obtain stable housing or income and his whereabouts were currently unknown. Respondent left voicemails for the caseworker on three occasions from January to April 2022. The caseworker returned those calls and ultimately attempted to contact respondent on five different occasions from January 28, 2022, through April 21, 2022. Each time, respondent did not answer those calls and the caseworker either left a message or was unable to do so because the voicemail for the number provided had not been set up or belonged to someone named "Rachelle" and was full. Finally, the updated status reports indicated a concern for respondent's ability to provide the minors with a safe environment, noting his questionable decisions regarding healthy relationships and his police involvement. The reports note that respondent was incarcerated from December 16, 2020, until December 22, 2021, that respondent had been arrested on numerous occasions since the case was opened, and that the minors' mother had obtained a new order of protection against respondent in January 2020. The updated reports

ultimately recommended that it was in the minors' best interests to terminate respondent's parental rights.

¶ 15    A prove-up hearing on the State's petitions was held on May 12, 2022. Respondent did not appear, though his appointed counsel was present. Sarah Green, the assigned caseworker from Children's Home, testified to the services that respondent was required to engage in during the period of April 11, 2011, through January 11, 2022. During that period, respondent did not engage in or complete any of the services required of him. Respondent was incarcerated from December 2020 until December 2021, and Green had no contact with respondent after his release. Respondent and Green traded voicemail messages. The first service plan, which was dated December 16, 2021, and covered the prior six months, rated the goal of a return home as unsatisfactory for respondent. That plan concluded that the goal of a return home within 12 months was no longer appropriate due to respondent's lack of progress toward reunification and that the court had changed that goal to a return home within 23 months. A second service plan, which was dated January 20, 2022, and covered the prior six months, also rated the goal of a return home as unsatisfactory for respondent. The plan noted that respondent had not participated in any court-ordered services or otherwise made reasonable progress and that the goal of a return home was no longer appropriate.

¶ 16    Under cross-examination by respondent's attorney, Green acknowledged that respondent was incarcerated as of April 11, 2021. On July 26, 2021, Green spoke to the facility where respondent was incarcerated and was informed that the only services available were Alcohol Anonymous, adult basic education, and substance abuse. Other than those three, none of the services ordered by the trial court were available to respondent from April 11, 2021, until his release from prison on December 22, 2021. Respondent was not able to participate in those services

- 7 -

because he was on a waiting list, and he remained so until his release. Respondent did not attempt to contact the caseworker or Children's Home immediately after his release but did leave a voicemail for Green sometime prior to January 11, 2022. The trial court ultimately found that the State had met its burden of proving respondent's unfitness by clear and convincing evidence. The court then set the case for a best interest hearing.

¶ 17　　　　Updated best interest reports regarding the minors were then filed. Those reports noted that the minors had been in substitute care for 1282 days. The report noted that respondent was arrested on an outstanding warrant on July 9, 2022, and that he remained incarcerated as of the date of the updated best interest report. Those reports also detailed the reasons the minors had been removed from the home and respondent's failure to engage in any services aimed toward his reunification with the minors.

¶ 18　　　　A best interest hearing was held on July 21, 2022. Respondent appeared at the hearing via video from jail, where he was incarcerated following a recent arrest. The various agencies involved in this case submitted best interest reports for each minor and Green, the assigned caseworker, testified for the State. Her testimony and the best interest reports detailed that the minors had been in substitute care for 1282 days. They also detailed respondent's ongoing difficulties in completing services, including obtaining employment and stable housing as well as the various classes the court ordered respondent to complete. Respondent did not engage in any of those services or contact his caseworker even after his release from prison. A third child had been born to respondent and the minors' mother in 2020, and all three siblings lived with the same foster parents. The foster parents were best able to provide for the minors' development and significant medical needs and gave them a sense of permanence and continuity. The minors were attached to the foster parents and felt loved and valued by them. The foster parents met all the minors' needs,

- 8 -

and there were no concerns about their safety. The minors were too young to express their wishes but referred to the foster parents as "mom and dad" and to their house as "home." Respondent's last visit with the minors was in 2021, while he was incarcerated, and he had not sent the minors any cards, letters, or gifts. After considering all the statutory factors, the reports recommended that it was in the minors' best interests to terminate respondent's parental rights.

¶ 19 The foster mother testified that the minors lived in her home with her husband, their biological son, and the minors' third sibling. The minors were bonded to the members of the household and to other relatives of the foster parents and they had made friends with other children in the neighborhood. The foster mother also testified to the minors' significant medical needs and how she and the foster father were meeting them. The foster parents loved the minors and wished to adopt them.

¶ 20 Testifying in his own defense, respondent said that he did not know that the attorney appearing on his behalf at the best-interests hearing was his current court-appointed public defender. Respondent tried to contact his prior public defender on several occasions and called Green on at least 20 occasions after he was released from prison. He gave Green his and his grandmother's phone number each time. Respondent testified that when this case began, he provided Green with family members in the area who could care for the minors. Respondent even went to Children's Home in Peoria, Illinois, but Green was on vacation, and respondent was given a bus pass and sent home. Respondent wanted his children and expressed a willingness to do anything to get them back. Respondent claimed to need a new caseworker who would communicate with him properly and with the minors' mother. Under cross-examination, respondent testified that he did not know the date he went to Children's Home, but it was

approximately one month ago. Respondent acknowledged that he was currently in jail for possession of a stolen bicycle.

¶ 21 After considering the testimony, the reports filed, the various orders that had been entered during the duration of the case, and the statutory best interest factors, the trial court terminated respondent's parental rights. The court noted that I.H. was about to turn five years old and that she had been in foster care since she was one and a half years old. J.H. was about to turn four and had been in foster care since she was three months old. The court found that respondent had been given years to address the minors' needs and demonstrate an ability to parent them appropriately. The court also noted that respondent had failed to appear at most of the hearings in this case. The court believed that respondent only attended hearings when he was incarcerated and the prison was able to arrange for his appearance. The court agreed with the guardian *ad litem* that it did not appear that respondent would be able to care for the minors for the foreseeable future. The court also noted the minors' significant medical needs, in which respondent was uninvolved, were being addressed by the foster parents. Given the amount of time in substitute care and lack of progress by respondent, the identities, backgrounds, cultural and religious ties of the minors all grew out of substitute care. Additionally, the sense of security, familiarity, attachment, and continuity of affection all favored termination of parental rights and placement of the minors with the foster parents. The court concluded that the State had met its burden of proof by a preponderance of the evidence.

¶ 22 This appeal followed.

¶ 23 II. ANALYSIS

¶ 24　　　　Counsel seeks to withdraw as appointed appellate counsel for respondent. Counsel asserts that there are no arguable issues of merit to be raised on appeal. After carefully reviewing the records on appeal, we agree that this appeal lacks any viable issues relating to the unfitness finding and the best interests determination. Moreover, there is no reason to conclude that respondent received ineffective assistance of counsel or that he was deprived of due process. See *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23 ("Due process in the context of interference with parental rights is achieved by compliance with the provisions of the Juvenile Court Act and fundamental fairness.").

¶ 25　　　　The termination of parental rights is a two-step process. "Under the Juvenile Court Act, parental rights cannot be terminated absent the parent's consent unless the court first determines, by clear and convincing evidence, that the parent is an 'unfit person' as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2010)). (705 ILCS 405/2-29(2) (West 2010))." *In re N.G.*, 2018 IL 121939, ¶ 28. The trial court's finding of unfitness will not be overturned on appeal unless it is against the manifest weight of the evidence. *In re M.I.*, 2016 IL 120232, ¶ 21. " 'A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent.' " *Id.* (quoting *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005)).

¶ 26　　　　In this case, the State sought to terminate respondent's parental rights pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)) for failing to make reasonable progress during the nine-month period of April 11, 2021, through January 11, 2022. Subsection 1(D)(m)(ii) of the Adoption Act states that if a service plan has been established to correct the conditions that brought the minors into substitute care, failure to substantially fulfill the requirements of that service plan results in a failure to make reasonable progress. *Id.*

¶ 27    After reviewing the record, we conclude that the trial court's unfitness finding was not against the manifest weight of the evidence. The minors were removed from the home due to a history of domestic violence between respondent and mother that took place in the minors' presence, respondent's drug abuse, and his inability to provide the minors with a safe and stable home environment. In fact, respondent stipulated to the allegations in the petitions for shelter care. Respondent was advised on multiple occasions that his parental rights could be terminated if he failed to cooperate with DCFS or comply with the service plan and correct the conditions that required the minors to be placed in care. Respondent was given multiple tasks designed to help him address the issues identified in the petition and enable him to provide the minors with a stable and safe home. However, respondent failed to engage in or complete any of these services. Each service plan rated respondent's progress as unsatisfactory and concluded that he failed to make reasonable progress toward a return home. Respondent also failed to attend hearings on the case, visit with the minors regularly, or even maintain appropriate contact with his caseworker. As the trial court noted, these were all choices made by respondent, and his failure to make reasonable progress cannot be excused by his incarceration. See *In re J.L.*, 236 Ill. 2d 329, 342-43 (2010) (holding that incarceration during the nine-month period does not excuse the failure to make reasonable progress). Finally, the record shows that respondent also failed to engage in any services or communicate with his caseworker even when he was not in prison. Based upon these circumstances, the trial court concluded that respondent was unfit due to his failure to make reasonable progress. After reviewing the record, we cannot say that the opposite conclusion is clearly apparent.

¶ 28    Following a finding of unfitness, the second step in the termination of parental rights is to consider whether the termination of those rights serves the child's best interests. "[A]t

a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State must prove by a preponderance of the evidence that termination of parental rights is in the minor's best interests. *Id.* at 366. The determination of whether the termination of parental rights serves a minor's best interests relies on the consideration of several factors, including:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006); see also 705 ILCS 405/1-3 (4.05) (a)-(j) (West 2020).

We will not reverse a trial court's best interests finding and termination of parental rights unless it is against the manifest weight of the evidence. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 68.

¶ 29 The trial court's best interests finding was not against the manifest weight of the evidence. The court noted that the minors had been in substitute care for approximately three and a half years—or most of their lives—and the foster parents were the only parents that they knew. The minors had a strong bond with the foster parents and with other members of the foster family. As all the submitted reports indicated, the foster parents loved the minors and provided them with a safe and stable home and with a sense of love, permanence, and continuity. The foster parents

were also able to address the minors' significant medical needs, which the biological parents had not been able to do. The foster parents provided for the minors' needs and wished to provide them permanency via adoption. On the other hand, the minors had no bond with respondent, and respondent's visits with the minors were sporadic at best, including during his incarceration. During those visits, the minors did not appear to know who respondent was and had no bond with him. Despite the length of time the minors had been in foster care, respondent had failed to take steps to provide the minors with a safe and stable home, and there was no indication that he could provide for their welfare or their physical and emotional safety in the future. The same issues that initially caused the minors to be removed from the home still existed at the time of the best interests hearing.

¶ 30                                    III. CONCLUSION

¶ 31        For the reasons stated, we agree with respondent's appointed appellate counsel that there are no potentially meritorious issues presented here. We therefore grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 32        Affirmed.