2023 IL App (2d) 230098-U
No. 2-23-0098
Order filed July 7, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* AVANT B., a Minor, | ) | Appeal from the Circuit Court |
| | ) | of De Kalb County. |
| | ) | |
| | ) | No. 19-JA-59 |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee, v. Latosha F., Respondent- | ) | Sarah Gallagher Chami, |
| Appellant). | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*: Trial court's findings that mother was unfit and that terminating her parental rights was in the minor's best interest were not against the manifest weight of the evidence.

¶ 2   On November 28, 2022, the trial court found the appellant, Latosha F., unfit pursuant to section 1(D)(m) of the Adoption Act (Act) (750 ILCS 50/1(D)(m) (West 2020)), finding that she had: failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minor, Avant B.; failed to protect him from conditions in his environment injurious to his health; and, for a nine-month period after adjudication, failed to make reasonable efforts to correct the conditions that brought him into care and failed to make reasonable progress toward his return

to her care. The trial court later found that that it was in the best interests of Avant that Latosha's parental rights be terminated and that he be made available for adoption. Latosha appeals, and we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Avant was born on June 1, 2016. Latosha is his mother, and they lived with two older siblings: P.E. and L.S. His father's parental rights are not at issue in this appeal.

¶ 5     The family was referred to the Department of Children and Family Services (DCFS) for intact family services in 2018. In 2019, Latosha, P.E., and L.S. were arrested while out together. L.S. was arrested for criminal trespass, auto theft, and burglary; he already had a lengthy juvenile arrest record. At the time of the arrests, P.E. was on home detention for battery. A warrant had been issued for Latosha's arrest, as she had stood by watching without attempting to prevent P.E. from committing the earlier battery.

¶ 6     On October 30, 2019, the State filed a petition for adjudication of wardship for Avant, alleging that one of his siblings had reported inappropriate sexual contact by someone in the home, that his siblings P.E. and L.S. were "morally deficient," and that domestic violence had occurred within the home in his presence. Custody was granted to DCFS, which placed him in relative foster care with his adult sister, Marissa H. On February 10, 2020, Latosha stipulated that Avant's environment had been injurious to his welfare in that P.E. and L.S. were morally deficient, and the trial court adjudicated him neglected.

¶ 7     In March 2020, a prehearing report by DCFS stated that Latosha was visiting Avant for two hours each week and had begun mental health and substance abuse treatment at the Ben Gordon Center. Latosha reported that she used alcohol and marijuana laced with PCP. In May and June of 2020, the police were called twice to domestic disputes in Latosha's home.

¶ 8    In June 2020, the trial court issued an order making Avant a ward of the court and setting the goal as return home within 12 months.

¶ 9    In September 2020, CASA (which had been appointed as the guardian *ad litem* for the minor) reported that Latosha had been diagnosed with an alcohol abuse disorder, but she discontinued her substance abuse treatment and continued to drink. On the positive side, Latosha was taking parenting classes. The next month, however, the police were again called to a domestic dispute at her home.

¶ 10    At a November 2020, permanency hearing, the trial court found that Latosha had not made reasonable efforts during the previous six months. That same day, Avant was removed from his sister's care after it appeared that the home was not appropriate for him, and he was placed in non-relative foster care.

¶ 11    In reports filed in December 2020 and March 2021, CASA and the agency indicated that Latosha was maintaining contact with the agency and was seeing the children regularly through non-contact visits (due to COVID-19 protocols), although she had missed a few visits. Although Latosha stopped participating in services at the Ben Gordon Center, complaining to the agency that the staff just wanted to medicate her, she also repeatedly confirmed that she understood that she needed to complete the services that were offered in order to get her children back. Nevertheless, service plans filed in April 2021 (for November 2020 and April 2021) noted that Latosha had commenced mental health treatment at the Ben Gordon Center but then failed to comply with the program requirements. As of July 2021, the agency reported that Latosha had made unsatisfactory progress in meeting the goals of her service plan and had failed to utilize the supports outlined for her to correct the conditions that brought her children into foster care. In July 2021, the trial court found that Latosha had failed to make reasonable efforts or substantial

progress toward the return of her children during the period of November 2020 to April 2021, and it reserved its finding regarding the appropriate permanency goal.

¶ 12 In October 2021, the agency reported that Avant was doing well in his foster care placement. The agency had screened Avant's case for a change in the goal of his court case in light of the parents' failure to make progress on their service plans. Latosha was having weekly visits with Avant, but the agency noted that she did not interact much with Avant during the visit, instead watching him play. The agency suggested that the parents might benefit from a parenting class, as they seemed to lack knowledge of child development and appropriate discipline methods.

¶ 13 On November 30, 2021, the State filed a motion to terminate both parents' rights with respect to Avant. The agency thereafter filed a report that was almost identical to the report from two months' earlier, except that visits were now only monthly and took place in Latosha's home under agency supervision. The agency again recommended parenting classes. On December 10, 2021, the trial court conducted a permanency hearing. It found that Latosha had not made reasonable efforts or substantial progress during the previous period, and changed the goal to substitute care pending a decision on termination of parental rights.

¶ 14 During the following year (2022), a permanency hearing was held in April, but the record contains no agency report and the trial court did not enter any findings with respect to the parents' efforts or progress. In October 2022, CASA reported that Avant continued to do well in his foster placement and was well-bonded to that family. Given the change in goal for the case, there was no new service plan and no report on any steps taken by the parents.

¶ 15 The trial court held a hearing on the State's motion to terminate parental rights on November 28, 2022. Both parents were present in court. The sole witness was Rachel Williams, the DCFS caseworker for the family. Williams testified that the case began as an intact family

case. When it changed to a placement case, the service plan from the intact family case was carried forward into the placement case. Latosha was recommended to engage in counseling and psychiatric (medical mental health) services, take parenting classes and demonstrate protective parenting skills, complete a substance abuse assessment and treatment, comply with random drug testing, demonstrate sobriety, and engage in counseling related to her history of domestic violence with Avant's father.

¶ 16    Latosha did not engage meaningfully with these recommended services during the period from February 2020 (when Avant was adjudicated neglected) through May 2021. Although she twice began mental health services, she was discharged both times for lack of compliance. Throughout the case, Latosha had failed to complete 90% of her random drug tests, and this continued as recently as two months ago. Further, as late as February 2021, police were called to her home for domestic disputes.

¶ 17    On cross-examination, Williams acknowledged that Latosha had diabetes, had either contracted or been exposed to COVID-19 twice, and had some cognitive delays, all of which could make completing services more difficult. Williams agreed that, in the time since May 2021, Latosha had in fact completed almost all of the recommended services. She had successfully completed individual counseling, parenting classes, and substance abuse assessment and treatment. She was continuing to get psychiatric services and was compliant in taking her medications. She had fully participated in domestic violence counseling, although that service provider would not release records of her completion. Latosha told her caseworkers that she was not currently taking any substances, and she tested negative in drug tests in July 2021, May 2022, and June 2022. She had maintained her contact with Avant in visits. Nevertheless, Williams maintained that Latosha had not made reasonable progress toward the return of Avant to her care,

because her sobriety could not be verified and she was still expressing that she did not know why her children had been removed and lacked understanding of how to provide a safe environment for her children. At the close of the hearing, the trial court found that the State had proven all four grounds of unfitness that it had alleged.

¶ 18    The best-interest hearing took place on March 3, 2023. After Avant's caseworker Deann Evans testified, the trial court found that it was in Avant's best interest to terminate the parental rights of Latosha. This appeal followed.

¶ 19                                II. ANALYSIS

¶ 20    Termination of parental rights is a two-step process. *In re M.I.*, 2016 IL 120232, ¶ 20. First, the trial court must find, by clear and convincing evidence, that the parent is unfit. *Id*. Second, the court must determine, by a preponderance of the evidence, whether termination of parental rights is in the minor's best interest. *Id*.

¶ 21    Because the termination of parental rights constitutes a complete severance of the legal relationship between the parent and child, proof of parental unfitness must be clear and convincing. *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 88. The trial court is in the best position to assess the credibility of witnesses, and a reviewing court may reverse a trial court's finding of unfitness only where it is against the manifest weight of the evidence. *In re M.I.*, 2016 IL 120232, ¶ 21. A decision regarding parental unfitness is against the manifest weight of the evidence where the opposite conclusion is clearly the proper result. *Id*. Each case concerning parental unfitness is *sui generis*, meaning that factual comparisons to other cases by reviewing courts are of little value. *In re C.E.*, 406 Ill. App. 3d 97, 108 (2010).

¶ 22    In this case, the trial court found Latosha unfit on four grounds. Although section 1(D) of the Adoption Act (Act) (750 ILCS 50/1(D) (West 2020)) sets forth several grounds under which a

parent may be deemed unfit, any one ground, properly proven, is sufficient to sustain a finding of unfitness. *M.I.*, 2016 IL 120232, ¶ 43. Thus, we must sustain the trial court's finding of unfitness if any of the four grounds of unfitness is supported by the record.

¶ 23     In this case, the record clearly supports the trial court's finding pursuant to section 1(D)(m)(i) of the Act that Latosha failed to make reasonable efforts during a nine-month period after the February 2020 adjudication of neglect. Williams testified that Latosha did not really begin to engage in the recommended services until May 2021, over a year after the adjudication. Before then, Latosha had twice begun counseling but had been discharged for noncompliance both times. She had abandoned the substance abuse treatment program and parenting classes she began, and had failed to pass any of her assigned random drug tests. Further, she had failed to create a safe home environment: the police had been called to her home for domestic disputes at least four times between May 2020 and February 2021. This evidence amply supports the trial court's finding of no reasonable efforts during a nine-month period after adjudication.

¶ 24     Latosha argues that she did eventually comply with almost all of the recommendations of her service plan, making especially significant strides in the last six months before the fitness hearing. Those efforts were praiseworthy, and we do not minimize them. But section 1(D)(m)(i) of the Act is clear: the failure to make reasonable efforts to correct the conditions that led to the child's removal during *any* nine-month period after adjudication will support a finding of parental unfitness. 750 ILCS 50/1(D)(m)(i) (West 2020). Latosha's later commendable efforts unfortunately do not overcome her failure to start those efforts earlier. As the record supports the trial court's finding of unfitness on this ground, that finding was not against the manifest weight of the evidence.

¶ 25    Latosha also challenges the trial court's determination, following the March 2023 hearing, that it was in Avant's best interest to terminate her parental rights. In making such a determination, a trial court must consider an array of statutory factors relating to the child's well-being. See 705 ILCS 405/1-3(4.05). Latosha does not identify any statutory factors that she believes the trial court misapplied. Rather, she argues that she was not given the opportunity to show that, like Avant's foster family, she also could meet Avant's needs.

¶ 26    Under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq*. (West 2018)), the best interests of the minors is the paramount consideration to which no other takes precedence. *In re I.H.*, 238 Ill. 2d 430, 445 (2010). In other words, a child's best interest is not to be balanced against any other interest; it must remain inviolate and impregnable from all other factors. *In re Austin W.*, 214 Ill. 2d 31, 49 (2005). Even the superior right of a natural parent must yield unless it is in accord with the best interests of the child involved. *Id*. at 50.

¶ 27    A reviewing court will not disturb the trial court's decision regarding the termination of parental rights unless it is against the manifest weight of the evidence. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 65. The reason for this deferential standard is that the trial court is in a superior position to assess the witnesses' credibility and weigh the evidence than we are. *Id*. ¶ 66. A trial court's decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *In re William H.*, 407 Ill. App. 3d 858, 866 (2011).

¶ 28    In challenging the trial court's determination that it was in Avant's best interest that Latosha's parental rights be terminated so that he could enjoy permanency in his foster placement, Latosha argues that she was not given the opportunity to show that she could provide for Avant's physical safety and welfare, and that there was no evidence "at any time" that she could *not* provide that. However, the record refutes her argument. Starting in 2018, even before Avant's removal,

when the family was receiving intact family services, Latosha had ample opportunity to demonstrate that she could maintain a home that was safe and conducive to Avant's well-being. Instead, the record documents her failure to manage her drinking and substance abuse, to adequately supervise her older children, and to keep her home free from the threat of domestic violence. In arguing otherwise, Latosha simply ignores the evidence in the record. She has not shown that the trial court's determination was against the manifest weight of the evidence.

¶ 29                        III. CONCLUSION

¶ 30    For the reasons stated, the judgment of the circuit court of De Kalb County is affirmed.

¶ 31    Affirmed.