NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230560-U

NOS. 4-23-0560, 4-23-0561, 4-23-0562 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 9, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* DAR. H., DAY. H., and DI. H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
|       Petitioner-Appellee, | ) | Nos. 19JA1, |
|       v. | ) |     19JA2, |
| Demond H., | ) |     19JA21 |
|       Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Curtis S. Lane, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Harris and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The appellate court affirmed the trial court's fitness and best-interests findings.

¶ 2    Respondent, Demond H., is the father of Dar. H. (born March 2007), Day. H. (born August 2009), and Di. H. (born March 2019). In April 2023, in proceedings involving all three children, the trial court found respondent was an unfit parent. In May 2023, the court found that termination of respondent's parental rights would be in the minor children's best interests.

¶ 3    Respondent appeals, arguing that the trial court's findings that (1) respondent was an unfit parent and (2) termination of respondent's parental rights was in the children's best interests were against the manifest weight of the evidence. We disagree and affirm.

¶ 4                       I. BACKGROUND

¶ 5              A. Procedural History Regarding Dar. H. and Day. H.

¶ 6        In January 2019, the State filed petitions for adjudication of neglect as to Dar. H. and Day. H., alleging the children lived in an environment that was injurious to their welfare. In support, the State alleged that, in December 2018, an incident of domestic violence occurred between respondent and the children's mother, Tosha B., in the presence of Dar. H. See 705 ILCS 405/2-3(1)(b) (West 2018). As a result of that incident, respondent was arrested and ordered not to have any contact with Tosha. (We note that Tosha is not a party to this appeal.)

¶ 7        The State also alleged that three days after the December 2018 domestic violence incident, Ashleigh Ruark, a social worker, "was assigned to [(investigate)] a report regarding a domestic violence altercation between [Tosha and respondent]." That same day, Ruark interviewed respondent at the residence with Tosha, and respondent stated that he had used cocaine, marijuana, and alcohol. At the time of those incidents, Tosha was about five months pregnant with Di. H.

¶ 8        Also in January 2019, on the same day the petitions were filed, the trial court conducted a shelter care hearing and placed temporary custody of Dar. H. and Day. H. with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 9        In March 2019, the trial court conducted an adjudicatory hearing regarding Dar. H. and Day. H. The court found that the children were neglected minors as alleged in the petition, noting that "the finding of abuse/neglect/dependence is based on the following facts: Domestic violence with child present. Mother['s] use of drugs (cocaine, cannabis, benzo) and prior indication [of neglect]."

¶ 10        In April 2019, the trial court conducted a dispositional hearing regarding Dar. H. and Day. H., at the conclusion of which it entered a written order finding (1) respondent unfit for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or

discipline the minors and (2) it was in the best interests of the minors to be made wards of the court. The court placed guardianship and custody of the minors with the guardianship administrator of DCFS.

¶ 11                             B. Procedural History Regarding Di. H.

¶ 12          In May 2019, the State filed a petition for adjudication of wardship as to Di. H., alleging she was a neglected minor based upon (1) the domestic violence incident between respondent and Tosha, (2) Dar. H.'s and Day. H.'s being adjudicated neglected, (3) respondent's being found unfit to exercise custody or guardianship of Day. H.'s siblings the month prior, (4) Tosha's testing positive for cocaine, marijuana, and benzoylecgonine at Di. H.'s birth in January 2019, and (5) respondent's failure to complete "all services required in the pending cases" (see *id.* § 2-3). On the same day that petition was filed, the trial court conducted a shelter care hearing and placed temporary custody of Di. H. with the guardianship administrator of DCFS.

¶ 13          In July 2019, the trial court conducted both an adjudicatory hearing and dispositional hearing regarding Di. H. The court found that Di. H. was a neglected minor in that her environment was injurious to her welfare, writing, "The finding of abuse/neglect/dependence is based on the following facts: Domestic violence between parents, unfitness in 19 JA 01 + 19 JA 02 of both parents." The court also found (1) respondent unfit for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline Di. H. and (2) it was in the best interests of Di. H. to be made a ward of the court. The court placed guardianship and custody of Di. H. with the guardianship administrator of DCFS.

¶ 14                             C. The Termination Hearing

¶ 15          In January 2023, the State filed amended petitions to terminate respondent's

parental rights as to Dar. H., Day. H., and Di. H. As to each child, the State alleged respondent was an unfit parent within the meaning of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)) because he failed to (1) make reasonable efforts to correct the conditions that were the bases for the children's removal during the nine-month periods of (a) March 2019 to December 2019 and (b) July 2021 to April 2022, (2) make reasonable progress toward the return of the children within those same nine-month periods, and (3) maintain a reasonable degree of interest, concern, or responsibility as to the minor children's welfare. See *id.* § 1(D)(b), (m)(i)-(ii).

¶ 16        In March, April, and May 2023, the trial court conducted bifurcated termination hearings on the State's petitions.

¶ 17                1. *The Fitness Portion of the Termination Proceedings*

¶ 18                        a. Randall Aldridge

¶ 19        Randall Aldridge testified that he worked for the Center for Youth and Family Solutions (CYFS) and was the caseworker for the family from April 2019 through October 2019. Aldridge reviewed the case file and notes from prior caseworkers when he received the file.

¶ 20        Aldridge testified that in July 2019, respondent "had another domestic incident" with Tosha in Galesburg, Illinois.

¶ 21        Aldridge testified that the service plan for respondent required him to complete (1) a class directed at perpetrators of domestic violence, (2) a substance abuse assessment and treatment, (3) drug drops, and (4) mental health treatment. While Aldridge was the family's caseworker, respondent successfully completed a dual program in Chicago for mental health and substance abuse. However, after that, respondent did not demonstrate progress in those areas by refraining from substance abuse and domestic violence.

¶ 22                        b. Alyssa Franqui

¶ 23        Alyssa Franqui testified that she worked for CYFS and was the caseworker for the family from October 2019 through May 2021.

¶ 24        Franqui testified that respondent's service plan required him to (1) cooperate with the agency, (2) attend parenting classes, and (3) engage with mental health services. Franqui testified that respondent successfully completed parenting classes, but she could not recall whether he successfully completed mental health services. Regarding respondent's cooperation with the agency, he "was not successful entirely." She explained, "There were long period of times where we were not in contact with [respondent] due to cell phone or not able to have him at visits, supervised visits, just due to his location and then lack of communication." She stated, however, that respondent did cooperate with the agency for certain periods of time.

¶ 25                                c. Cecily Dorsett

¶ 26        Cecily Dorsett testified that she worked for CYFS as the regional coordinator of child welfare and was involved in the family's case from July 2021 to April 2022.

¶ 27        Dorsett testified respondent's service plan required him "to [(1)] complete domestic violence services, [(2)] complete substance abuse [services], [(3)] cooperat[e] [with the agency], [(4) maintain stable] housing, and [(5) maintain stable] income." Regarding housing and income, Dorsett testified that respondent "did not have stable housing. He stayed with Tosha on and off. He was in and out of jail. He did not have a residence of his own and no reported income during that time frame." Regarding substance abuse, respondent was not successful. Dorsett explained that in October 2021, "[respondent] overdosed and had to be revived with Narcan. Following that, he did go to Gateway and completed treatment on December 24th of '21 but then there was a subsequent relapse and concerns and reports of ongoing drug use in the beginning of 2022." Dorsett stated that she could not verify the reports of continued drug use

because respondent generally would not participate in drug screens, but he did test positive for cocaine in August 2021.

¶ 28 Regarding domestic violence, Dorsett testified that respondent did not engage in his domestic violence classes and was unsuccessfully discharged. Regarding visitation, respondent visited the children only one time in March 2022. She stated, "[D]uring that visit he left the room for approximately 20 minutes and was in the bathroom. When he returned, he struggled to stay awake and actually fell asleep during the visit so there were significant concerns he may have used substances in our bathroom."

¶ 29 d. Carolyn Hawes

¶ 30 Carolyn Hawes testified that she worked at CFYS and had been the family's caseworker since April 2022. Her biggest concern with respondent regarded visitation with the children. Specifically, she stated that "[t]he January visit and February visit reports indicated that [respondent] struggled with appropriateness with community members or waitresses, and that during his visits, he pays more attention to [Day. H.] than the [other] two."

¶ 31 Regarding the January visit at the restaurant, Hawes testified that respondent got upset with a waitress and demanded that his food be discounted "half-off" because of the length of time he had to wait for his food. Respondent "was aggressive enough that the waitress had the manager come over and talk to him."

¶ 32 e. Respondent

¶ 33 Respondent testified that in April 2022, he had been in substance abuse inpatient treatment for 40 days at Bridgeway, which he successfully completed. After completing the treatment at Bridgeway, respondent rented an apartment and has since remained sober. Further, respondent stated that he had (1) completed parenting classes the week before the fitness hearing,

(2) rented an apartment, and (3) obtained a job.

¶ 34    f. The Trial Court's Parental Fitness Findings

¶ 35    After hearing the arguments of the parties, the trial court noted that it considered evidence regarding (1) the March 2019 to December 2019 time period and (2) the July 2021 to April 2022 time period.

¶ 36    Regarding the evidence, the trial court stated the following:

"The evidence produced during the first time period was that there was almost zero completion of any services. There was a domestic violence incident. There [were] missed drug drops. There were relapses. ***

The—again, there were additional relapses. There was—was a lack of visitation. There was a refusal to do drug drops on behalf—behalf of [respondent]. ***

[Respondent] was kicked out of domestic violence courses and did not reengage during that time period. The—the—the reality here is that case numbers 19-JA-1 and 19-JA-2 technically commenced in January of 2019. That's over four years old. The other case, 19-JA-21, started in May of '19 and is approaching four years old.

And I don't disagree with [respondent's counsel]. It—you know, the State has elected to allow this to continue for a period of time, which I disagree with personally because of the—I've never quoted a prosecutor before, but [the prosecutor] stated, and I agree, the only consistency is the inconsistency in this case for the parents. They cannot keep it together. There are always problems. Always problems. They will do one thing but not the other. There are problems

with the visits. It—it—it—it does not stop regardless of the time periods."

¶ 37    The trial court concluded that the State had proved by clear and convincing evidence all three grounds for unfitness in the petition to terminate parental rights (see 750 ILCS 50/1D(b), (m)(i)-(ii) (West 2022)).

¶ 38         2. *The Best-Interests Portion of Termination Proceedings*

¶ 39    In May 2023, the trial court conducted a hearing on the best-interests portion of termination proceedings regarding the three children. The court began the hearing by noting that it had received best-interests reports written by CYFS and the court-appointed special advocate filed in May 2023.

¶ 40                    a. Carolyn Hawes

¶ 41    Hawes testified that she was employed by CYFS and was the caseworker for the three children. She believed the children needed long-term stability, which respondent had not been able to provide.

¶ 42    Regarding Dar. H., Hawes testified that he was currently placed in the "residential facility at 'Transitional Center, Inc.' in East St. Louis" since December 2022 because he was "unable to stabilize in a foster home" and had "significant behavioral issues, including being arrested last fall." Dar. H. would not agree to adoption or guardianship. In her opinion, Dar. H. would not allow anyone to parent him, which is why Hawes recommended a goal of independence for him. (We note that Dar. H. was 16 years old at the time of the best-interests hearing.)

¶ 43    Regarding Day. H., Hawes testified that she had been placed in a behavioral specialized foster home for about two years. Day. H. had "multiple behaviors such as stealing, and most recently, she flipped her desk in her classroom." However, the foster parent met her

needs, and she was able to visit her biological siblings. Day. H. attended school and was involved in extracurricular activities. She had bonded with her foster parent (calling her "grandmother"), her foster parent's family, and the children in the neighborhood. Day. H. expressed a desire to remain with her foster parent if she could not return to her mother's care. Day. H.'s foster parent wanted to adopt her.

¶ 44 Regarding Di. H., Hawes testified that Di. H. had been placed in a licensed foster home for about a year and a half, which she shared with her two-year-old brother, Dav. H. (We note that Dav. H. is not a party to this appeal.) At the foster placement, Di. H. had her needs met, bonded with the foster parents, calling them "mommy" and "daddy," attended preschool, sang, danced, and was happy. The placement was stable, and the foster parents wanted to provide permanency for Di. H.

¶ 45 Hawes did not believe that respondent could provide for the children's physical safety and welfare.

¶ 46 b. The Trial Court's Best-Interests Determination

¶ 47 The trial court found that it was in the children's best interests that respondent's parental rights as to each child be terminated. The court acknowledged that respondent loved his children and was bonded with them, but he had not made much progress in creating a stable and safe home environment.

¶ 48 The trial court emphasized that Dar. H. and Day. H. had been out of the home for "four years, four months and nine days," and Di. H.'s case had been open for four years and five days. The court stated that it considered all the best-interests factors, and it listed the factors it found applicable. The court stated that the unrebutted evidence showed that the children wanted to return home to Tosha, but it noted, as the State argued at the fitness hearing, that the "only real

reoccurring issue here is instability on both of the parents' parts."

¶ 49        The trial court did not believe that respondent would ever be stable enough to care for the children, especially given that two of the children had intensive special needs and one had never lived with either of the parents. Ultimately, the court concluded that the children needed permanence and the only way to achieve that was to terminate respondent's parental rights.

¶ 50        This appeal followed.

¶ 51        II. ANALYSIS

¶ 52        Respondent appeals, arguing that the trial court's findings that (1) respondent was an unfit parent and (2) termination of respondent's parental rights was in the children's best interests were against the manifest weight of the evidence. We disagree and affirm.

¶ 53        A. The Fitness Determinations

¶ 54        Respondent argues the trial court's findings that respondent failed to (1) make reasonable efforts, (2) make reasonable progress, or (3) maintain a reasonable degree of interest as to each child were against the manifest weight of the evidence. It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11, 143 N.E.3d 805.

¶ 55        Based on our review of the record, we conclude that the trial court's findings (in each case) that respondent failed to make reasonable progress within the second nine-month period were not against the manifest weight of the evidence. Accordingly, we discuss only those findings.

¶ 56        1. *The Applicable Law and Standard of Review*

¶ 57        The State must prove unfitness as defined in section 1(D) of the Adoption Act

(750 ILCS 50/1(D) (West 2022)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2022). Reasonable progress is an objective review of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 51, 187 N.E.3d 763. Reasonable progress exists when the trial court can conclude that, in the near future, it will be able to order the children returned to parental custody. *Id.*

¶ 58        A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. Accordingly, a trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 59                                2. *This Case*

¶ 60        The record in this case amply supports the trial court's findings that respondent failed to make reasonable progress toward the return of his children to his care from July 2021 to April 2022. For example, Dorsett testified that from July 2021 to April 2022, respondent did not progress with domestic violence treatment or substance abuse treatment, did not have stable housing or income, and only attended one visit with his children during which the caseworker had a significant concern that respondent used drugs in the bathroom. Further, (1) in August 2021, respondent tested positive for cocaine; (2) in October 2021, he overdosed; and (3) in early

2022, Dorsett received reports that respondent was using drugs, which could not be verified or dispelled because respondent did not appear for drug screens. He also did not engage with domestic violence services and was "unsuccessfully discharged from his domestic violence classes at the health department."

¶ 61　　　　Nonetheless, respondent asserts that his not committing domestic violence between July 2021 and April 2022 and maintaining sobriety since March 2022 shows that he made objective progress toward the return of the minors to his care. We disagree. Although respondent's progress toward self-improvement is commendable, much of it occurred outside of the nine-month period alleged in the petition.

¶ 62　　　　In short, abundant evidence existed that between July 2021 and April 2022, respondent had not made measurable progress such that the children could be returned home in the near future. Accordingly, we conclude that the trial court's findings were proper.

¶ 63　　　　　　　　　　B. The Best-Interests Determinations

¶ 64　　　　　　　　　　1. *The Applicable Law and Standard of Review*

¶ 65　　　　At the best-interests stage of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interests. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interests determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes

and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953.

See 705 ILCS 405/1-3(4.05) (West 2022).

¶ 66 A reviewing court affords great deference to a trial court's best-interests finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interests determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 67                                     2. *This Case*

¶ 68 Here, after stating that it had considered all the best-interests factors, the trial court concluded that termination of respondent's parental rights was in the best interests of the children largely because of their need for permanence, which respondent would never be able to provide. The record shows that respondent relapsed on drugs consistently, could hardly care for his own needs, and obtained stability only at the very end of the termination proceedings.

¶ 69 Day. H. and Di. H. lived with foster families who met their needs and with whom they had bonded. Those foster placements indicated they would be willing to provide permanence. Regarding Dar. H., the record established that he had behavioral needs that respondent would never be able to meet, and respondent is not in a position to teach him how to

lead a stable, independent life when respondent is unable to lead one himself. Moreover, the testimony shows that Dar. H. was unlikely to submit to anyone parenting him. Given Dar. H.'s age and needs, an independence goal, with an eye toward preparing him to care responsibly for himself, is in his best interests. As the trial court noted, the case had gone on for over four years, and the children needed permanence.

¶ 70      We conclude the trial court's findings that termination of respondent's parental rights was in the children's best interests were not against the manifest weight of the evidence.

¶ 71                  III. CONCLUSION

¶ 72      For the reasons stated, we affirm the trial court's judgment.

¶ 73      Affirmed.