2024 IL App (1st) 240321-U

SIXTH DIVISION

September 27, 2024

No. 1-24-0321

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* M. B.-G., C. B.-G., minors, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Respondents-Appellees, | ) | |
| | ) | |
| (THE PEOPLE OF THE STATE OF ILLINOIS | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 17 JA 374 |
| v. | ) | 17 JA 375 |
| | ) | |
| | ) | |
| | ) | |
| Michael G., | ) | Honorable |
| | ) | Andrea M. Buford, |
| Respondent-Appellant.) | ) | Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Tailor and Justice Hyman concurred in the judgment.


**ORDER**

¶ 1    ***Held:***    We reverse the circuit court's finding that appellant Michael G. was unfit as a parent and the termination of his parental rights, and remand for a new fitness hearing, because the court functionally denied appellant his statutory right to distinct fitness and best interest hearings.

¶ 2    Appellant Michael G. (Michael) appeals from the circuit court's termination of his parental rights respecting his minor children M. B.-G. and C. B.-G. per the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). He argues the court erred by improperly folding the fitness and best interest hearings into one proceeding. We agree, and accordingly, we reverse the court's finding of unfitness and the termination of Michael's parental rights, and remand for appropriately bifurcated proceedings.

¶ 3                                    BACKGROUND

¶ 4    On April 21, 2017, the State filed petitions for adjudication of wardship against Michael and his wife Carmen B. (Carmen), who is not a party to this appeal, regarding their minor children M. B.-G. and C. B.-G. In the petitions, the State alleged the children were neglected because their parents did not provide "the proper or necessary support, education as required by law, or medical or other remedial care," and forced the children to live in an " injurious" environment, and further alleged the children were abused because the parents posed a "substantial risk of physical injury" to the children. See 705 ILCS 405/2-3(1)(a), (b) (West Supp. 2015); 705 ILCS 405/2-3(2)(ii) (West Supp. 2015). The petitions stated that Carmen B. had two prior Department of Children and Family Services (DCFS) reports alleging she provided inadequate food and inadequate supervision, and posed a substantial risk of injury to the children. The petitions further alleged that following these reports, Carmen and Michael did not comply with services, and did not respond to nutrition issues relating to C. B.-G., who was diagnosed with failure to thrive. Carmen had "mental health issues" and admitted "to non-compliance with recommended medications and psycho-therapy." The State moved that the children be placed in temporary custody. The circuit court granted the State's

petitions for both M. B.-G. and C. B.-G., and further granted temporary custody to DCFS with the right of placement for both children.

¶ 5    An affidavit from Deborah Harris of DCFS contained in the record indicates that Carmen's reports arose from incidents in March 2016 and June 2016. The affidavit, which also contains statements from Michael, indicates that following the incidents, he agreed not to allow Carmen to be left unsupervised with M. B.-G. and C. B.-G. Harris noted Carmen suffered from "Schizoaffective with Bipolar disease and PTSD." Michael stated Carmen treated these issues with a "holistic approach," which included eating "rice and mushrooms." It was alleged that Michael did not provide a safety plan for the minors while in Carmen's care.

¶ 6    On January 30, 2018, the circuit court adjudicated the children abused or neglected on each alleged ground. The court explained Carmen had failed to address her mental health issues or make progress in services, and Michael left the children with Carmen. That same day, the court entered disposition and permanency orders. The disposition order adjudged the children wards of the court and found Carmen and Michael unable for a reason other than financial circumstances to care, protect, train, or discipline M. B.-G. and C. B.-G., and placed the children in the custody/guardianship of DCFS with right to placement. The permanency order listed a goal of return home within 12 months, and stated Carmen and Michael needed to complete recommended services. Permanency orders of July 23, 2018; March 25, 2019; and October 11, 2019, had the same permanency goal.

¶ 7    On September 10, 2020, the circuit court entered a permanency order with a new goal of substitute care pending termination of parental rights. The order stated that the foster parents desired to adopt M. B.-G. and C. B.-G., and that the parents were in services but "not addressing

why the kids are in DCFS care and are not able to utilize the skills they learned in parenting [classes]."

¶ 8 On October 7, 2021, the State filed petitions seeking termination of parental rights and a supplemental petition for appointment of a guardian with the right to consent to adoption. The petition alleged that both Michael and Carmen had (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to their children's welfare (per 750 ILCS 50/1(D)(b) (West 2020)); (2) failed to make reasonable efforts to correct the conditions that were the basis for removal, and/or make reasonable progress towards the return of their children (per 750 ILCS 50/1(D)(m) (West 2020)); and (3) were unable to discharge parental responsibilities due to mental impairment or illness (per 750 ILCS 50/1(D)(p) (West 2020)). The State later withdrew the mental impairment ground for Michael. The State specified seven distinct nine-month time periods during which Michael failed to correct conditions and/or make progress towards return.

¶ 9 The termination hearing began on July 11, 2023.

¶ 10 At the beginning of the hearing, the court admitted a series of exhibits, which are contained in the record on appeal. Generally, the exhibits show that while M. B.-G. and C. B.-G. were in DCFS custody, their cases were administered by multiple organizations, including DCFS, Jewish Child and Family Services (JCFS), and Hephzibah Children's Association (HCA).

¶ 11 A DCFS psychological and parenting capacity assessment of Michael filed on January 30, 2018, stated that Michael "exhibits difficulty with managing priorities and meeting basic needs of minor, such as food and diapers." During his interview, Michael stated Carmen was a good mother and could properly care for the children. He expressed that he did "not understand why his children were removed and believes that he was treated unfairly." The evaluation noted that he sometimes left the children alone with Carmen.

¶ 12    A July 18, 2018 letter from Stepping Stones Child Care indicated that M. B.-G. and C. B.-G. exhibited concerning behavior on the days immediately after visits with their parents, but were otherwise improving while in foster care.

¶ 13    In a March 2019 Permanency Hearing Report to the Court, JCFS recommended the goal of substitute care pending termination because Michael and Carmen "have not made progress in their services." JCFS stated that both parents had not completed a psychiatric assessment or obtained a medical card, downplayed M. B.-G.'s and C. B.-G.'s diagnosed medical conditions, and had a "rigid point of view and are unable to adapt to their children's needs."

¶ 14    The exhibits also show that following DCFS intervention with his children, Michael completed parenting classes with Metropolitan Family Services and Project Hope, and complied with mental health services.

¶ 15    An evaluation of Michael from December 2022 (generated pursuant to the separate custody matter of Michael and Carmen's youngest child, Mi. B.-G.), noted that DCFS had previously described Michael as an "attentive, interactive, empathic, and supportive parent during visits" who was "bonded" well with the children. The evaluation acknowledged that Michael did "not have any acute mental illness" and did not need mental illness services. Michael admitted that Carmen could become "agitated" or "irritated" during visits with the children. The evaluation further noted that during interactions with Mi. B-G., Michael displayed "positive parenting abilities in all four areas" involved in the evaluation, specifically (1) ability to provide structure and safety, (2) ability to foster growth and development, (3) capacity for empathy, and (4) ability to provide nurturance, love, and acceptance. It concluded that Michael "presents with sufficient parenting skills currently to minimally meet the needs of Mi. B.-G. The primary issue with respect to whether he can make

the gains necessary to achieve the goal of Return Home is whether he can provide consistent parenting and safety for [Mi. B.-G.] on his own with [Carmen] also present."

¶ 16   In a DCFS contact note from caseworker Shontay Nelson dated December 21, 2022, M. B.-G. is claimed to have told Nelson, "Can you tell the judge that my [foster] mom is awesome and doing the best that she can so we can stay here and be adopted please?"

¶ 17   Similarly, a clinical staffing summary dated February 23, 2023, indicated that the children had "adamantly" refused to visit with Michael and Carmen. The summary also noted that Michael "appeared to lack insight regarding the trauma his children had experienced," "continually interrupted," and "denied that he and/or his wife had caused the children any trauma." Michael also maintained "the children were in no danger when he left them with their mother."

¶ 18   An evaluation of Michael dated April 10, 2023, indicated Michael did not intend to separate from Carmen, and did not provide information regarding family members or friends who could "help provide support and supervision should he be unavailable and a minor is returned home," despite the agency requesting this information on multiple occasions.

¶ 19   During the hearing, Elodie Betend testified that she currently worked at HCA, and previously with JCFS, as a caseworker. She was M. B.-G. and C. B.-G.'s caseworker for JCFS from July 2018 to January 2020. In August or September of 2019, Carmen was discharged from individual therapy and could not be referred to another therapist because she was "not being medication compliant." Regarding Michael, Betend testified that he completed a psychiatric assessment, after which no additional psychological services were recommended. Additionally, Michael attended individual therapy "semi-sporadic[ally]."

¶ 20   Betend attended supervised visits between M. B.-G., C. B.-G., and their parents. Initially, Michael and Carmen attended consistently. This changed when safety concerns arose, specifically

when, on three occasions, M. B.-G. ran towards the street during visits. M. B.-G. was "about five" years old around the time of the incidents, which occurred after Michael and Carmen completed parenting classes. On one occasion, M. B.-G. "almost was hit by a vehicle." Betend informed Michael that in the future he needed to carry M. B.-G., but Michael responded that it was not a "big situation." The agency moved visits from the library to an agency facility in response to this incident, and Michael and Carmen reacted with sporadic attendance (approximately 60% of the visits). Betend never recommended that M. B.-G. and C. B.-G. be returned home.

¶ 21    During her time at JCFS, Betend spoke to the couple about their decision to stay together and parent together "maybe quarterly." She agreed Michael made more progress than Carmen from July 2018 to January 2020. Betend spoke to Michael about how Carmen's lack of progress could prevent him from regaining custody of M. B.-G. an C. B.-G. Michael said he understood, and "would do anything for his children," though he took no steps to separate from Carmen.

¶ 22    While employed by HCA, Betend was re-assigned to M. B.-G. and C. B.-G. as caseworker from May 2021 to October 2021. Carmen still had outstanding services and medication compliance issues. Michael also had an outstanding service for individual therapy, though he started seeing a new therapist in October 2021. During this time, the parents only had monthly virtual visits with M. B.-G. and C. B.-G., which Betend did not attend per a circuit court order. Betend again could not recommend return home, or change the recommendation of substitute care pending termination, because both parents had outstanding services.

¶ 23    The case was continued until September 7, 2023. On that date, on cross-examination by Michael's counsel, Betend testified that one reason visits remained virtual after the COVID-19 pandemic abated was that following in-person visits, the children would suffer "dysregulation," have "night terrors," and M. B.-G. would act aggressively in school and daycare. During visits,

the children would also hit each other and eat "off of the floor." Michael expressed his desire to return to in-person visits in 2021.

¶ 24   On cross-examination by counsel for Carmen, Betend replied "Correct," to counsel's proposition that, "This case never moved in the direction of reunification in spite of the fact that the parents have done all that they were required to do, from services to visitation."

¶ 25   On redirect, Betend testified both parents had outstanding services in October 2021. Betend also described an incident in October 2019 where Carmen tried to strike Betend, and referenced another "incident" in November 2019 between herself and Carmen, after which the circuit court ordered Betend not to attend visits.

¶ 26   Shoshanna Sandler testified that she was M. B.-G.'s and C. B.-G.'s caseworker for HCA, and started on the case in February 2023. Sandler relayed Carmen's physician's concern at the time that Carmen "had not continually taken her medication." Carmen also declined to complete a new psychological evaluation, another required service.

¶ 27   Regarding Michael, Sandler confirmed that he completed individual therapy. Michael was also required to provide a safety plan should his children be returned. Sandler believed she requested the plan from Michael on more than three occasions, both via email and in-person conversations, but he did not comply. A plan was necessary because Michael and Carmen were still in a relationship, meaning Michael needed a plan to account for Carmen's untreated mental health issues, but he did "not display[] the understanding of [Carmen] as a safety concern to the children." She also testified that Michael "presented with an understanding of some of [Carmen's] mental health challenges, but has not presented understanding the risk that it poses to the children." Michael also failed to comply with services by not facilitating the completion of a child endangerment risk assessment protocol (CERAP) home inspection, despite agency attempts to

both schedule the CERAP and to complete it during unannounced home visits. The parents' visits with M. B.-G. and C. B.-G. were virtual. The parents attended consistently, but M. B.-G. and C. B.-G. did not. Sandler never recommend during her time as caseworker that the visits be lengthened, unsupervised, or changed to in-person.

¶ 28   On cross-examination by the attorney for the public guardian, Sandler testified that M. B.-G. struggled during virtual visits with his parents, and C. B.-G. often did not participate at all. Both children informed Sandler they did not want to visit with their parents. Regarding the parents' living situation, Michael told Sandler he was willing to move out of the house he shared with Carmen, but had not yet done so.

¶ 29   The matter was continued until November 20, 2023, at which time Piper Caldwell, a foster care supervisor for HCA, testified that she had been the case supervisor for M. B.-G. and C. B.-G. since March 2022. At a meeting in August 2022, Caldwell asked Carmen if she believed she needed mental health services, and Carmen responded that she did not. Caldwell asked Michael how he felt about Carmen's position on her mental health services, and he indicated that he supported "her desire to treat her chronic and persistent mental illness with natural remedies." Michael reiterated his belief that there were no "problems" with Carmen's ability to parent, either now or at the outset of the case. Caldwell testified that Michael also denied that M. B.-G. and C. B.-G. had medical issues, despite their medical records indicating otherwise, and failed to provide a safety list containing the names and contact information of family and friends who could support him should he regain custody.

¶ 30   On cross-examination by Michael's attorney, Caldwell acknowledged that starting in the summer of 2021, the children visited therapist Sandy Esparza, and their foster parents paid for these visits. Caldwell agreed in-person visits between the children and their parents did not resume

because Esparza did not recommend them. On cross-examination by Carmen's attorney, Caldwell testified that M. B.-G. and C. B.-G. "consistently expressed the desire not to" visit with their parents. Caldwell believed the children "backed off from visits significantly more" after their foster father died in October 2022. She relayed the children stated they did not want the visits because they were worried they would be taken from their foster family.

¶ 31    Cynthia Scott, a therapist who had treated M. B.-G. and C. B.-G. beginning in February 2023, testified that she "thoroughly" did not believe "in-person [visits] should occur" between the children and their parents. Scott observed virtual visits, and had concerns with both parents. Regarding Carmen, Scott was concerned that she seemed disinterested and the conversation was "quite cold." Regarding Michael, Scott was concerned that his "conversation was pretty much demanding and very hard," and "sort of 'I'm the father, and so I tell you what to do,' and never the concern to hear the child out."

¶ 32    On cross-examination by the attorney for the public guardian, Scott testified that M. B.-G. and C. B.-G. "have over and over just stated that they do not want to have visits with their parents." M. B.-G. complained that Michael "yells at him and tells him that he is his only father." Scott believed the visits caused "more harm than good."

¶ 33    Duron Hebron testified that he was M. B.-G.'s and C. B.-G.'s caseworker as of October 2, 2023. Michael still had not completed his safety list or the CERAP. M. B.-G. and C. B.-G. also told him they no longer wanted visits with their parents, and expressed fears that Michael would take them away from their foster home. On cross-examination from Carmen's attorney, Hebron maintained Michael's safety list only related to his potentially regaining custody of Mi. B.-G.

¶ 34    The State and the public guardian both rested. Michael testified that he told Hebron he could not provide the names of family members who could support him because, while there were such

individuals who could help, including his sisters, cousins, aunts, and nieces, "they just don't want to be caught up, I guess you call it, in the rigamarole of all this."

¶ 35    Regarding Carmen, Michael testified she had "minor forms of schizoaffective disorder and bipolar disorder," of which he had been aware since April 2017. She had previously engaged in cognitive therapy. Currently, she used herbal supplements and vitamins, and she and Michael did "cognitive work" on their own.

¶ 36    Following argument, the circuit court ruled as follows:

"Before I rule, let me just say, I believe that this agency, they just did not properly handle this case at all. I find that Ms. Betend's testimony was very troubling. She could not recall certain favorable testimony during her direct. She kept trying to add additional answers seemingly in an attempt to sway the opinion of the Court. She had trouble answering direct questions. There are obvious issues with that worker since I did remove her from overseeing visitations.

I find Ms. Caldwell's testimony also troubling. It appears she had limited recall, especially when it comes to having anything positive to say about the parents or their services. On the issue of visits, I fin[d] extremely troublesome that the children allegedly refused visits with the parents, and the agency took no steps to encourage those visits.

However, I have to do what is in the best interest of the minors at this point in time. I find that the mother failed to maintain a reasonable degree of interest, concern, or responsibility. She failed to make reasonable efforts to correct the conditions, which were the basis for the removal of the children from her and to make reasonable progress towards return. She is unable to discharge her parental responsibilities because of mental impairment, illness, or retardation.

I find that the father has failed to make reasonable efforts to correct the conditions which were the basis for the removal and to make reasonable progress towards the return of the children to the parent. Ground M only for the father.

With respect to the mother, the mother clearly has a mental disability that has been described in testimony and in written reports including the Ground P evaluation, which says it is a long-term condition. Additionally, she failed to complete the services which maybe could have led to the return of the children to her. The reports indicate involvement, interactions with the children were very unfavorable.

With respect to the father and during the relevant time period, the father does not believe that the mother has an issue that could affect her parenting, nor does he believe the children have issues. And, again, he could not see an issue with the mother's parenting, as such he is likely not going to work towards correcting those conditions. The statements are that he is unable to achieve a return home goal. Notwithstanding the above, the father was given an opportunity to provide a list of support persons who could care for the children in the event that he was unable to do so. He failed to provide that list. He was also to allow a CERAP of his home, and again, he failed to cooperate.

Again, I strongly believe the case was mishandled by the agency, but again, I have to do what's in the best interest of the children. I have considered all of the evidence, including the facts that the children have been in care since 2017. I have listened to the case law cited by the Guardian, and I find that it is in the best interest of the children to terminate the rights of the parents.

They do have a right to appeal today's decision terminating their parental rights."

12

¶ 37    The State's attorney then interjected, "Judge. We are not at best interest." The circuit court responded, "Sorry. Sorry. That's the ruling of the Court, clear and convincing evidence." The court then scheduled a best interest hearing for February 1, 2024.

¶ 38    On February 1, 2024, during the best interest hearing, the circuit court first took judicial notice of the testimony from the fitness hearing and its findings on November 20, 2023. The State re-called Hebron and Scott, along with Katelyn Raddatz, M. B.-G.'s and C. B.-G.'s foster mother. Following the hearing, the court again found it was in M. B.-G.'s and C. B.-G.'s best interest that both Michael's and Carmen's parental rights be terminated and a guardian be appointed with the right to consent to M. B.-G.'s and C. B.-G.'s adoption. The court's termination order, entered that same day, found the State had provided clear and convincing evidence to terminate Carmen's rights based on 750 ILCS 50/1(D)(b), (m), and (p) (West 2020), and Michael's rights based on 750 ILCS 50/1(D)(m) (West 2020). Michael filed his notice of appeal on February 13, 2024.

¶ 39                                JURISDICTION

¶ 40    The circuit court terminated Michael's parental rights on February 1, 2024, and Michael filed his notice of appeal on February 13, 2024. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 303 (eff. July 1, 2017).

¶ 41                                ANALYSIS

¶ 42    Michael appeals from the circuit court's termination of his parental rights. Illinois law provides a two-step procedure for involuntary termination of parental rights. *In re Adoption of Syck*, 138 Ill. 2d 255, 276-77 (1990); 705 ILCS 405/2-29(2) (West 2020). In the first stage, the State must prove by clear and convincing evidence that the parent is unfit as defined in the Adoption Act. *In re M.I.*, 2016 IL 120232, ¶ 20. The circuit court cannot consider the best interests of the child when making a parental fitness determination. *Id.* Fitness determinations are only

13

based on a parent's past conduct, and thus evidence of the "child's welfare and whether the child's eventual adoption *** would improve his future financial, social and emotional atmosphere is not relevant." *Syck*, 138 Ill. 2d at 276. "A single hearing consolidating issues of unfitness and best interests carries a risk of prejudice from considering evidence irrelevant to the unfitness question before determining that issue." *In re V.S.*, 285 Ill. App. 3d 372, 375 (1996). When the circuit court improperly conflates the proceedings, remand for a bifurcated hearing is appropriate. See *In re D.R.*, 307 Ill. App. 3d 478, 484 (1999) (quoting *In re A.P.*, 277 Ill. App. 3d 593, 600 (1996) ("A separate hearing and determination of the child's best interest is mandatory")). Only after the court determines that a parent is unfit will the proceeding progress to the best interest stage. *In re J.L.*, 236 Ill. 2d 329, 337 (2010).

¶ 43   We find that the circuit court held a conflated hearing in which it simultaneously determined both Michael's fitness and the best interests of M. B.-G. and C. B.-G., and as such, we reverse the court's findings on Michael's fitness and parental rights and remand the matter for new, appropriately bifurcated proceedings. The court's November 20, 2023 colloquy demonstrates that it made a comprehensive finding on both fitness and best interest following the fitness hearing. The court referenced the children's "best interest" on three separate occasions during its colloquy, and concluded it was in the "best interest of the children to terminate the rights of the parents." Moreover, the court explained that it felt compelled to reach this conclusion, despite misgivings about both the fitness witnesses against Michael and how the agencies handled the matter, specifically because it had to consider the "best interest" of the children. The bifurcation process was designed to protect against this situation, and the State's attempt to redirect the court does not change the clarity of its findings and expressed in the colloquy. See *In re V.S.*, 285 Ill. App. 3d at 375; see also *Syck*, 138 Ill. 2d at 276-77. It follows that the court denied Michael his right to

"mandatory" separate proceedings, making reversal and remand for such proceedings appropriate. See *In re A.P.*, 277 Ill. App. 3d at 600; see also *In re D.R.*, 307 Ill. App. 3d at 484.

¶ 44    In so finding, we note that while Michael did not raise an evidentiary claim (which he makes explicit in his reply brief), the record shows without question that the State presented, and the circuit court admitted, best interest evidence during the fitness phase—most glaringly, the repeated statements in the exhibits and testimony that M. B.-G. and C. B.-G. preferred to stay with their foster parents and not visit with Michael and Carmen. While we do not address whether admitting such evidence was error, the potential for the testimony to be considered in an improper, prejudicial light is obvious. See *In re V.S.*, 285 Ill. App. 3d at 375.

¶ 45    The appellees urge that even if the circuit court improperly considered the children's best interest during the parental fitness phase, it corrected itself, and then held a separate best interest hearing on a later date, satisfying the mandatory bifurcated hearing requirement. We acknowledge that this case contrasts with others involving a single proceeding (See *In re D.R.*, 307 Ill. App. 3d at 484); after the State's attorney corrected the court, it changed its finding to only "clear and convincing evidence," and conducted another hearing at a later date. These facts do not alter our analysis, however, because the court's November 20, 2023 colloquy demonstrates that it had already reached its ultimate conclusion regarding Michael's parental rights before the separate February 1, 2024 hearing even began. In so doing, the circuit court functionally denied Michael's statutory right to distinct fitness and best interest phases, making this case substantively indistinguishable from those where a court conducts a single hearing. See *Id.*; 705 ILCS 405/2-29(2) (West 2020).

¶ 46    Finally, because we reverse and remand on this procedural ground alone, we do not reach the parties arguments regarding the substantive merits of the circuit court's fitness determination.

¶ 47                                    CONCLUSION

¶ 48    The circuit court functionally conflated the fitness and best interest phases into one proceeding. Hence, we reverse its unfitness finding and its termination of Michael's parental rights, and remand for appropriately bifurcated proceedings.

¶ 49    Reversed and remanded.