# Illinois Official Reports

## Supreme Court

---

### *In re M.I.*, 2016 IL 120232

---

| | |
|---|---|
| Caption in Supreme Court: | *In re M.I.*, a Minor (People of the State of Illinois, Appellant, v. J.B., Appellee). |
| Docket No. | 120232 |
| Filed | December 15, 2016 |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Peoria County, the Hon. Albert Purham, Judge, presiding. |
| Judgment | Appellate court judgment reversed. Circuit court judgment affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Jerry Brady, State's Attorney, of Peoria (Carolyn E. Shapiro and David L. Franklin, Solicitors General, and Daniel J. Hartweg, Assistant Attorney General, of Chicago, and Patrick Delfino, Terry A. Mertel, and Laura E. DeMichael Bialon, of the Office of the State's Attorneys Appellate Prosecutor, of counsel), for the People. |
| | Susan K. O'Neal, of Peoria, for appellee. |

Robert F. Harris, Kass A. Plain, and John David Jarrett, of the Office of the Cook County Public Guardian, of Chicago, for *amicus curiae* Cook County Public Guardian.

Barry C. Taylor, Laura J. Miller, and Jin-Ho Chung, of Equip for Equality, of Chicago, *amicus curiae*.

Diane Redleaf, of Chicago, for *amicus curiae* Family Defense Center *et al.*

| Justices | JUSTICE GARMAN delivered the judgment of the court, with opinion. |
| | Chief Justice Karmeier and Justices Freeman, Thomas, Kilbride, Burke, and Theis concurred in the judgment and opinion. |

## OPINION

¶ 1    The State filed a petition to terminate the parental rights of J.B. for failing to maintain a reasonable degree of interest, concern, or responsibility for his daughter M.I.'s welfare (750 ILCS 50/1(D)(b) (West 2014)) and for failing to make reasonable progress toward the return of M.I. (750 ILCS 50/1(D)(m) (West 2014)). The juvenile court granted the State's petition. The appellate court, in a split decision, reversed and remanded, finding that the trial court's conclusions were against the manifest weight of the evidence. The dissenting justice would have affirmed the judgment of the juvenile court. We allowed the State's petition for leave to appeal, pursuant to Illinois Supreme Court Rule 315 (eff. Jan. 1, 2015), to determine (1) whether the appellate court improperly grafted a willfulness requirement onto subsections (b) and (m) of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2014)), (2) whether the juvenile court erred by not expressly stating that it did not consider evidence outside the nine-month period in ruling on subsection (m), (3) whether the juvenile court's ruling was against the manifest weight of the evidence, and (4) whether the State is limited to asserting subsection (p) when petitioning to terminate an intellectually disabled parent's rights. We allowed the Cook County Public Guardian as well as Equip for Equality, the Family Defense Center, the Chicago Coalition for the Homeless, Cabrini Green Legal Aid, and LAF (Legal Assistance Foundation) to file briefs as *amici curiae* pursuant to Illinois Supreme Court Rule 345 (eff. Sept. 20, 2010).

¶ 2    BACKGROUND

¶ 3    In July 2010, the Illinois Department of Children and Family Services (DCFS) petitioned for wardship of M.I., a minor, pursuant to section 2-3 of the Juvenile Court Act of 1987 (705 ILCS 405/2-3 (West 2014)). DCFS alleged that M.I.'s mother, E.I., had neglected her and that

M.I.'s father, J.B., had an extensive criminal history. The juvenile court granted the petition, finding M.I. to be neglected and also finding both parents, E.I. and J.B., to be fit. On October 13, 2010, the juvenile court directed J.B. to execute any necessary authorizations for release of information requested by DCFS, cooperate with DCFS, obtain a drug and alcohol assessment, submit to random drug testing twice monthly, undergo a psychological examination, and complete a parenting class.

¶ 4 In 2011, J.B. underwent a psychological examination per the juvenile court's directive. The examination revealed the following information about J.B. Until he dropped out of his senior year of high school, J.B. was enrolled in special education courses for learning disabilities. J.B. had been unemployed since 2007. J.B. had been incarcerated on eight different occasions for approximately 18 to 19 years in total but had not been incarcerated since 2005. J.B. suffers from bipolar disorder. Also, J.B. admitted to regular marijuana use but indicated that he had been clean for two months. It was further discovered that J.B. lacked his own residence, is functionally illiterate, and possesses an IQ of 58, indicating significant intellectual limitation and mild mental retardation. The psychologist concluded that, from an intellectual and academic perspective, J.B. could not independently parent M.I. and recommended that any interventions and services be modified. Additionally, the psychologist opined that J.B. could benefit from circumscribed interventions because J.B.'s functioning limited his ability to benefit from traditional mental health services involving verbal exchange.

¶ 5 On March 21, 2011, the State filed a motion to find J.B. unfit. The State asserted that J.B. did not attend drug testing or participate in a drug and alcohol evaluation and that J.B. refused to provide an address to his caseworker. The State's motion to find J.B. unfit was granted on March 30, 2011. Thereafter, at five different permanency hearings, the juvenile court found that he had failed to make reasonable efforts to achieve the service plan and permanency goal.

¶ 6 In May 2013, the juvenile court returned guardianship of M.I. to her mother, E.I., but subsequently found E.I. unfit and appointed DCFS as guardian. On April 30, 2014, the juvenile court found that J.B. had not made reasonable efforts, and the permanency goal was changed to "substitute care pending court decision."

¶ 7 In May 2014, the State filed a petition to terminate E.I.'s and J.B.'s parental rights. The State alleged that J.B. had (1) failed to maintain a reasonable degree of interest, concern, or responsibility under subsection (b) and (2) failed to make reasonable progress toward the return of M.I. between August 1, 2013, and May 1, 2014, under subsection (m).

¶ 8 At the adjudicatory hearings in December 2014 and February 2015 on the petition for termination of parental rights, the State presented the testimony of Brenda Lee, the assigned caseworker. Lee began working on the case on August 11, 2011. Lee testified that when she had asked J.B. about his drug use, he responded that he had been through classes before and was continuing to use marijuana. J.B. indicated that he would not stop using marijuana.

¶ 9 Lee further testified that, as of February 2012, J.B. had not provided DCFS with his address, had indicated that he would not stop using marijuana, and had not completed drug testing. Lee explained that she did not provide J.B. referrals for various services because she did not have J.B.'s contact information but did give J.B. information about community agencies offering such services. Lee initially gave J.B. bus passes to attend visitation and drug testing in Peoria. J.B. somewhat regularly attended visits with M.I. until he missed a week, attended two to three more visits, and then stopped. Lee ceased providing the passes when J.B.

began using them for other purposes. Beginning around August 2012, Lee required J.B. to call in before visits with M.I because J.B.'s inconsistent attendance was having a negative impact on M.I. Lee testified that J.B. followed this procedure for a couple of visits.

¶ 10 Although Lee was not certain, she did not believe that J.B. visited M.I. between August 15, 2012, and January 30, 2013. She did testify that J.B. did not complete drug testing during that period. As of April 23, 2013, J.B. had not visited M.I. or submitted to drug testing. He did attend permanency hearings. J.B. visited M.I. once in June 2013. J.B. completed an integrated assessment interview, and Lee restarted visits after M.I. went into foster care. J.B. visited twice in December 2013 and once in June 2014. A visit was scheduled the week before the December 2014 adjudicatory hearing but had to be rescheduled because M.I. was sick.

¶ 11 On cross-examination, Lee admitted that she never inquired about compliance with the Americans with Disabilities Act (ADA) or whether the parenting classes were proper for J.B. given his mental disabilities because J.B. did not follow through on services. Lee did not inquire into DCFS services or guidelines regarding homeless clients, did not provide J.B. any homemaker services, and did not modify his services. Although Lee had conversations with J.B. about restarting psychiatric care at the Human Service Center and had J.B. sign medical releases so Lee could obtain his medical records, J.B. did not follow up with the center.

¶ 12 The juvenile court found J.B. unfit under count IV, which alleged that J.B. failed to maintain a reasonable degree of interest, concern, or responsibility under subsection (b). The juvenile court specifically noted J.B.'s disinterest. Additionally, J.B. was found unfit under subsection (m) for failing to make reasonable progress toward reunification. The juvenile court commented that DCFS could not modify services for someone who did not show up. The juvenile court also noted that J.B.'s presence at some visits and attendance at court proceedings indicated that his failure to attend other visitations was a choice rather than a product of J.B.'s low IQ. The juvenile court stated that it had considered J.B.'s IQ and read through the psychological evaluation but nevertheless concluded that J.B. appeared to be disinterested. Specifically, the juvenile court stated:

"It's hard to modify services for a person that's not willing to show up. You know, you didn't maintain contact. You were inconsistent in your visits. You did come to court.

You have one visit from April 2013 to May of 2014. *** They probably could have modified services, but you're not making contact with the caseworker. You met her August 29th, 2011, and would not give her your address. How is she to maintain contact with you or modify services if you were unwilling to give her information to contact you? That's the decision you made.

I don't think it has anything to do with your IQ. As we look at this, you were able to use bus passes for the visits you did make. You were sporadic in your visits, and I think you understand the importance of making visits.

You know, but you made your visits that you saw fit. And you didn't visit on a regular basis. That was your choice. I understand the bus passes were taken away from you, because you were not using them for your visits. You do come to court. I commend you for that. But I think by clear and convincing evidence, you have not maintained a reasonable degree of interest, concern, or responsibility as to the minor's welfare.

And obviously during this period of time being May—excuse me—August 1, 2013[,] to May 1st, 2014, you weren't even really visiting with the child on a consistent basis as I said earlier. Therefore, I find Count 3 and 4 *** proven as to you ***."

¶ 13 On May 20, 2015, the juvenile court held a best interest and permanency review hearing. Lee's testimony was presented again. By May 20, 2015, additional permanency and best interest reports, a bonding assessment of J.B. and M.I., and a bonding assessment of M.I.'s foster parents were also before the juvenile court. The juvenile court found that DCFS had made reasonable efforts to achieve permanency. An order was entered terminating J.B.'s parental rights, and J.B. appealed.

¶ 14 The appellate court reversed in a split decision, finding that the juvenile court failed to take into account J.B.'s circumstances—his low IQ and functioning. The majority noted: "The record is clear that there was no consideration of how the respondent's mental retardation impacted his efforts to comply with the court's directives." 2015 IL App (3d) 150403, ¶ 16. Specifically, the majority stated:

"We cannot accept the trial court's determination that failing to complete a task that is beyond one's intellectual capacity is the same as refusing to comply with court-ordered directives and willfully not making reasonable progress toward the return of a minor child or willfully failing to maintain a reasonable degree of interest in the child." *Id.*

¶ 15 Important to the majority's holding was the fact that the State never provided J.B. a service plan and, therefore, the only benchmarks to measure J.B.'s progress were the tasks the trial court assigned. The majority believed that J.B.'s failure to schedule appointments, submit to all drug drops, attend all visitations, and provide an address to his caseworker might be sufficient to demonstrate a lack of reasonable progress or a failure to maintain a reasonable degree of interest if J.B. were not intellectually disabled. The majority also found that the juvenile court erred in considering evidence outside the nine-month period pertaining to the reasonable progress count under subsection (m). Further, the majority remarked that the statutory scheme of the Adoption Act "recognizes that there are situations where, as here, through no fault, a parent lacks the sufficient mental ability necessary to be responsible for the welfare of a child." *Id.*; see 750 ILCS 50/1(D)(p) (West 2014).

¶ 16 The dissent asserted that the majority reversed the juvenile court on a basis for which it had no legal authority and should not read into the Adoption Act a requirement that does not exist. 2015 IL App (3d) 150403, ¶ 25 (Schmidt, J., dissenting). The dissent noted: "whether respondent failed to make reasonable progress toward the return of M.I. or failed to maintain a reasonable degree of interest, concern or responsibility in her welfare because he is intellectually incapable or because he outright refused to do so is irrelevant to this court's inquiry." *Id.* ¶ 26. Furthermore, the dissent believed that the evidence supported the juvenile court's findings.

¶ 17 ANALYSIS

¶ 18 Before this court, the State argues that (1) the appellate court majority improperly grafted a willfulness requirement onto the plain language of subsections (b) and (m) of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2014)); (2) the juvenile court did not err by failing to

expressly state, when ruling on subsection (m), that it did not consider evidence outside the statutorily prescribed nine-month period of consideration; (3) the juvenile court's ruling was not against the manifest weight of the evidence; and (4) the State is not limited to asserting subsection (p) to terminate an intellectually disabled parent's parental rights.

¶ 19    "In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption Act." *In re E.B.*, 231 Ill. 2d 459, 463 (2008). Illinois policy "favors parents' superior right to the custody of their own children." *Id.* at 464.

¶ 20    Section 2-29 of the Juvenile Court Act sets forth a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2014). "First, the court must find, by 'clear and convincing evidence, that a parent is an unfit person as defined in Section 1 of the Adoption Act.' " *In re J.L.*, 236 Ill. 2d 329, 337 (2010) (quoting 705 ILCS 405/2-29(2) (West 2008)). "When ruling on parental unfitness, a court is not to consider the child's 'best interests.' " *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990). "Second, once a finding of parental unfitness is made under section 1(D) of the Adoption Act, the court considers the 'best interest' of the child in determining whether parental rights should be terminated." *In re J.L.*, 236 Ill. 2d at 337 (quoting 705 ILCS 405/2-29(2) (West 2008)).

¶ 21    "[A] finding of unfitness will not be reversed unless it is against the manifest weight of the evidence *** [because] the trial court's opportunity to view and evaluate the parties *** is superior to that of a reviewing court." *In re Brown*, 86 Ill. 2d 147, 152 (1981). "A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). "Each case concerning parental unfitness is *sui generis*, unique unto itself." *In re Adoption of Syck*, 138 Ill. 2d at 279.

¶ 22    Here, whether the juvenile court's findings were against the manifest weight of the evidence depends on whether subsections (b) and (m) of the Adoption Act expressly or implicitly contain a willfulness requirement. This court reviews issues of statutory interpretation *de novo*. *In re C.W.*, 199 Ill. 2d 198, 211 (2002). In relevant part, section D of the Adoption Act provides:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following, except that a person shall not be considered an unfit person for the sole reason that the person has relinquished a child in accordance with the Abandoned Newborn Infant Protection Act:
>
> * * *
>
> (b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.
>
> * * *
>
> (m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act. If a service plan has been established as required under Section 8.2 of the Abused and Neglected Child Reporting Act to correct the conditions that were the basis for the removal of the

- 6 -

child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication under Section 2-3 or 2-4 of the Juvenile Court Act of 1987. Notwithstanding any other provision, when a petition or motion seeks to terminate parental rights on the basis of item (ii) of this subsection (m), the petitioner shall file with the court and serve on the parties a pleading that specifies the 9-month period or periods relied on." 750 ILCS 50/1(D)(b), (m) (West 2014).

¶ 23 "Our primary objective in construing a statute is to give effect to the intention of the legislature." *In re J.L.*, 236 Ill. 2d at 339. "The most reliable indicator of the legislature's intent is the language of the statute, which must be given its plain and ordinary meaning." *Id.* "[A] statute should be read as a whole, considering all relevant parts." *Id.* "Where the statutory language is clear and unambiguous, there is no need to resort to other aids of construction." *In re C.W.*, 199 Ill. 2d at 211. "We may not depart from a statute's plain language by reading into it exceptions, limitations, or conditions the legislature did not express." *In re J.L.*, 236 Ill. 2d at 339.

¶ 24                    Whether Subsection (b) Contains a Willfulness Requirement

¶ 25 In finding that the juvenile court's fitness determination regarding subsection (b) was against the manifest weight of the evidence, the appellate court noted that, "[w]e cannot accept the trial court's determination that failing to complete a task that is beyond one's intellectual capacity is the same as refusing to comply with court-ordered directives and willfully *** failing to maintain a reasonable degree of interest in the child." 2015 IL App (3d) 150403, ¶ 16. The State asserts that, although the appellate court did not explicitly engage in statutory construction of subsection (b), the appellate court's ruling improperly grafts a willfulness requirement onto subsection (b). J.B. characterizes the appellate court's statement as *obiter dictum* that reflects existing precedent holding that "reasonable interest, concern or responsibility" must be measured in light of the parent's circumstances, which includes consideration of a parent's mental deficiency and poverty.

¶ 26 The language of subsection (b) is plain and unambiguous. Subsection (b) contains no state of mind requirement, nor does it carve out an exception for faultless failure. See 750 ILCS 50/1(D)(m) (West 2014). "In determining the plain, ordinary, and popularly understood meaning of a term, it is entirely appropriate to look to the dictionary for a definition." *People v. Bingham*, 2014 IL 115964, ¶ 55. "Failure" means "the fact of being cumulatively inadequate or not matching hopes or expectations." Webster's Third New International Dictionary 815 (2002). "Where the language is clear and unambiguous, courts may not read into it exceptions that the legislature did not express." *In re J.L.*, 236 Ill. 2d at 340. Thus, the plain meaning of the phrase "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" in subsection (b) includes all situations in which a parent's attempts at maintaining a reasonable degree of interest, concern, or responsibility are inadequate, regardless of whether that inadequacy seems to stem from unwillingness or an inability to comply.

¶ 27    Case law similarly indicates that subsection (b) contains no implied state of mind requirement. Rather, case law holds that a parent's reasonable interest, concern, or responsibility requires consideration of a parent's circumstances.

¶ 28    In *In re Adoption of Syck*, this court held that:

"[I]n determining whether a parent showed reasonable concern, interest or responsibility as to a child's welfare, [the trial court is required] to examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. Circumstances that warrant consideration when deciding whether a parent's failure to personally visit his or her child establishes a lack of reasonable interest, concern or responsibility as to the child's welfare include the parent's difficulty in obtaining transportation to the child's residence [citations], the parent's poverty [citation], the actions and statements of others that hinder or discourage visitation [citation], and whether the parent's failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference to, and lack of concern for, the child [citation]. If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest and responsibility, depending upon the content, tone, and frequency of those contacts under the circumstances. [Citations.] Also, mindful of the circumstances in each case, a court is to examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts. [Citation.]

    *** In a case proceeding under section 1(D)(b) of the Adoption Act, the issue is whether a parent maintained concern, interest and responsibility as to his or her child's welfare that, under the circumstances, was of a *reasonable* degree." (Emphasis in original.) 138 Ill. 2d at 278-80.

¶ 29    A parent's circumstances, such as an intellectual disability, do not necessarily or automatically redeem a parent's failure to demonstrate reasonable interest, concern, or responsibility. Nor do such circumstances fix a different standard of reasonableness. Rather, the question is whether a parent's then-existing circumstances provide a valid excuse. See *id.* at 276 ("[U]nlike other cases cited therein where there were transportation difficulties, financial limitations, or discouragement of parent's visitation by State agency, here there was *no valid excuse* for mother's lack of effort to communicate with child." (Emphasis added.)).

¶ 30    We find the Second District's decision in *In re E.O.* illustrative of this point. See *In re E.O.*, 311 Ill. App. 3d 720 (2d Dist. 2000). There, the appellate court noted that "a parent need not be at fault to be unfit" and a parent "is not fit merely because she has demonstrated *some* interest in or affection for her children; her interest, concern, and *responsibility* must be reasonable." (Emphases in original.) *Id.* at 727. The respondent mother argued that the evidence before the trial court did not demonstrate that she was unfit and that her chronic mental illness made it harder for her to visit or care for her children. *Id.* Specifically, the mother contended that the trial court failed to understand that the reasonableness of her behavior must be viewed in context of her mental illness. *Id.* Limiting its analysis to whether there was sufficient evidence that the mother failed to show a reasonable degree of interest, concern, or responsibility, the appellate court found that the trial court did recognize that the mother's mental illness at times required her to be hospitalized and required use of prescription

drugs. *Id.* Further, the appellate court held that the mother made voluntary decisions to distance herself from her children. *Id.* For example, when the mother's two children were in foster care, the mother moved to Florida for several months. *Id.* at 725. Before moving to Florida, the mother had missed most of her scheduled visits and sometimes failed to inform DCFS of her address. *Id.* at 728. The mother's failure to visit more regularly or keep in contact with DCFS was "not caused primarily by obstacles beyond respondent's control but, rather, by her own discouragement or inability to make the children's welfare the priority it would have to be if they were ever to be returned to her." *Id.* Although the mother "was still subjectively interested in her children, her conduct was not reasonable under all the circumstances." *Id.*

¶ 31    Similarly, in the present case, the juvenile court recognized obstacles facing J.B., such as his intellectual disability, but concluded that J.B. still had the ability to attend visitation and failed to do so. Whatever subjective interest J.B. may have for M.I., J.B.'s actions failed to demonstrate that interest. Just as the respondent mother's mental illness in *In re E.O.* did not provide a valid excuse for her failure to visit her children, J.B.'s intellectual disability and poverty do not provide him with a valid excuse for failing to attend visitation with M.I. Furthermore, and again like the respondent mother in *In re E.O.*, J.B.'s failure to attend visitation appears to be the result of his voluntary decision making. For example, when J.B. was inclined to do so, he attended most of the permanency hearings. We cannot, therefore, see how J.B.'s failing to consistently attend visitation is attributable to anything but a lack of interest.

¶ 32                              Manifest Weight of the Evidence

¶ 33    Alternatively, J.B. argues that the appellate court did not imply an element of willfulness into the statutory language of section 1(D)(b). Rather, the appellate court's statement was *obiter dictum* reflecting that J.B.'s intellectual disability and poverty were not sufficiently considered by the juvenile court.

¶ 34    After reviewing the record, we hold that the juvenile court's finding regarding subsection (b) was not against the manifest weight of the evidence. Limited to the facts in this case, the juvenile court properly considered J.B.'s circumstances before concluding that J.B. failed to demonstrate a reasonable degree of interest, concern, or responsibility.

¶ 35    J.B. sets forth multiple arguments as to why his circumstances were not adequately considered. J.B. contends that his failure to attend visitation stemmed from Lee's ceasing to provide him free bus passes and that it was unreasonable to expect a mentally ill, intellectually disabled homeless man to call by a certain time on visitation days to confirm visits. J.B. cites *In re Adoption of Syck*, 138 Ill. 2d at 278-79, and *In re Daphnie E.*, 368 Ill. App. 3d 1052 (2006), for the proposition that, because J.B. did not regularly attend visitation, the juvenile court was to consider other factors—like whether J.B. paid child support; sent M.I. gifts, cards, or letters; or was prevented by M.I.'s mother from visiting M.I. outside of scheduled DCFS-supervised visitations. The State, however, did not elicit testimony regarding such factors and only focused on visitation. The State declined to ask whether M.I.'s mother allowed J.B. to visit M.I. without DCFS supervision. J.B. contends that because he is functionally illiterate, has no income, and is homeless, he could not have been expected to pay child support; send M.I. gifts, cards, or letters; or navigate public transportation without the aid of free bus passes. Regardless, J.B. asserts that the burden was on the State to inquire about

other indicia of interest, concern, or responsibility since he was missing visitation. At oral argument, J.B. also contended that the juvenile court's ruling was cursory. Therefore, J.B. maintains that his circumstances were not considered by the juvenile court and the State failed to meet its burden of presenting clear and convincing evidence proving him unfit.

¶ 36    We disagree. Evidence of J.B.'s sporadic visitation sufficiently warrants the juvenile court's finding of unfitness. Attending visitation was not a task beyond J.B.'s intellectual capacity. See 2015 IL App (3d) 150403, ¶ 16. As noted by the assistant State's Attorney before the juvenile court, "whatever level of his ability, the first step is showing up." J.B.'s circumstances were considered when deciding whether his failure to visit M.I. established a lack of reasonable interest, concern, or responsibility as to her welfare. See *In re Adoption of Syck*, 138 Ill. 2d at 278-79. The juvenile court acknowledged J.B.'s low IQ. Despite his intellectual disability, mental illness, poverty, and homelessness, J.B. was able to navigate the bus system to make it to the majority of permanency review hearings, even after bus passes were taken away. He also attended some visits. The juvenile court concluded that J.B.'s failure to consistently attend visitation was due to choice rather than circumstance. A court looks to other factors such as letters or telephone calls "[i]f personal visits *** [were] somehow impractical." *Id.* at 279. The primary consideration is visitation; other factors demonstrating interest, concern, or responsibility are considered if visitation was impractical. The ability to consistently attend permanency review hearings does not demonstrate impracticality. As such, the juvenile court did not err by finding that J.B. failed to demonstrate interest, concern, or responsibility despite the lack of inquiry into whether J.B. wrote M.I. letters, called M.I., or made other such attempts to demonstrate his interest, concern, or responsibility.

¶ 37    J.B. argues that the juvenile court should have considered whether E.I. allowed visitation between J.B. and M.I. or whether J.B. visited M.I. outside supervised visitation. This contention fails. M.I. was in E.I.'s care from July 1, 2010, until October 30, 2013. A permanency review order entered March 30, 2011, specifically ordered that E.I. was not to supervise visits between J.B. and M.I.

¶ 38    Further, J.B. did not submit to court-ordered bimonthly drug tests. He also expressed an unwillingness to stop using marijuana. As the State argued at oral arguments, an unwillingness to cease using drugs represents a lack of responsibility.

¶ 39    We note that the parties presented arguments regarding the lack of a service plan and lack of modification to services and directives after the psychological evaluation concluded such was necessary to accommodate J.B.'s intellectual deficit. However, subsection (b) does not hinge on a parent's compliance with a service plan or directives. See 750 ILCS 50/1(D)(b) (West 2014) ("Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare."). In contrast, under subsection (m), a parent's "compliance with DCFS service plans is intimately tied to a parent's progress toward the return of the child, so much so, that where a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, the failure to make reasonable progress now includes the failure to 'substantially' fulfill the terms of that service plan." *In re C.N.*, 196 Ill. 2d 181, 217 (2001).

¶ 40    Regarding any intersection between the lack of service plan or service modifications and J.B.'s attendance at visitation, the lack of service plan or modifications does not excuse J.B.'s sporadic attendance. It was not evident that visitation was impractical given J.B.'s ability to

attend the majority of permanency review hearings. As noted by the dissent below and the State at oral argument, if a parent does not show up, a State agency is not required to go get the parent or force the parent to comply.

¶ 41 In sum, we do not find the juvenile court's finding as to subsection (b) to be against the manifest weight of the evidence.

¶ 42                                    Subsection (m)

¶ 43 In light of our conclusion regarding subsection (b), we decline to address the parties' arguments relating to subsection (m), including any concerns about a lack of a service plan or service modifications in this case. We also decline to address the question of whether a juvenile court must expressly state on the record, when ruling on subsection (m), that it did not consider evidence from outside the relevant nine-month period. "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d at 349.

¶ 44                 Whether the State Is Limited to Alleging Subsection (p)
                to Terminate an Intellectually Disabled Parent's Parental Rights

¶ 45 Implicit in this court's holding, and as expressly noted in the statute, the State has discretion to allege any ground it wishes when seeking to terminate parental rights regardless of a parent's intellectual disability. See 750 ILCS 50/1(D) (West 2014) ("The grounds of unfitness are any one or more of the following ***."). The State's choice is dependent upon the evidence. See *In re C.W.*, 199 Ill. 2d at 210 ("Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed 'unfit,' any *one* ground, properly proven, is sufficient to enter a finding of unfitness." (Emphasis in original.)). As a matter of statutory construction, this court "may not depart from a statute's plain language by reading into it exceptions, limitations, or conditions the legislature did not express." *In re J.L.*, 236 Ill. 2d at 339. Simply because another specific ground may also apply to a given case does not make the State's choice in proceeding under a different ground erroneous.

¶ 46                                     CONCLUSION

¶ 47 The plain and unambiguous language of subsection (b) does not contain a willfulness requirement. The juvenile court considered J.B.'s intellectual disability and other circumstances when it found J.B. unfit under subsection (b). As such, and particularly due to J.B.'s sporadic attendance at visitation, the juvenile court's finding that J.B. is unfit pursuant to subsection (b) was not against the manifest weight of the evidence. The State is not limited to alleging subsection (p) to terminate an intellectually disabled parent's parental rights. Because we conclude that the juvenile court did not err in finding J.B. unfit under subsection (b), we decline to address arguments regarding subsection (m).

¶ 48 Appellate court judgment reversed.

¶ 49 Circuit court judgment affirmed.