NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251378-U

NO. 4-25-1378

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 24, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* R.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macoupin County |
| Petitioner-Appellee, | ) | No. 22JA18 |
| v. | ) | |
| Jorda C., | ) | Honorable |
| Respondent-Appellant). | ) | Joshua Aaron Meyer, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Steigmann and Justice Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding (1) the appellate court lacked jurisdiction to consider challenges to the adjudicatory and dispositional orders, (2) respondent failed to show that the trial court's alleged failure to give her certain admonishments required vacating the court's order terminating her parental rights, and (3) the court's finding that respondent was unfit was not against the manifest weight of the evidence.

¶ 2    Respondent, Jorda C., appeals the trial court's order terminating her parental rights to her daughter, R.C. (born in 2019). Respondent argues that the court erred by (1) "granting the State's Motion for Default Adjudication based upon an unverified Petition for Adjudication of Wardship," (2) denying respondent's motion to vacate the adjudication, (3) failing to provide respondent with admonishments following the adjudicatory and dispositional hearings that she must cooperate with the Illinois Department of Children and Family Services (DCFS) and the terms of the service plan and correct the conditions that

required the minor to be in care or risk the termination of her parental rights, and (4) finding respondent was unfit. We affirm.

¶ 3                                            I. BACKGROUND

¶ 4          On May 26, 2022, the State filed a petition for adjudication of wardship concerning R.C. The petition alleged that R.C. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) in that respondent's drug use rendered the home an unsafe environment. That same day, the trial court entered an order granting temporary custody of R.C. to DCFS.

¶ 5          On November 21, 2022, the trial court entered an order of adjudication finding that R.C. was neglected in that she was in an environment injurious to her welfare. No transcript of the adjudicatory hearing appears in the record.

¶ 6          On January 11, 2023, respondent filed a motion to vacate the adjudicatory order. The motion stated that, unbeknownst to respondent's counsel, respondent was incarcerated at the time of the adjudicatory hearing and had been told the wrong date for the hearing by her caseworker. A docket entry indicates that this motion was denied on January 17, 2023, and respondent failed to appear at the hearing on the motion. No transcript of this hearing appears in the record.

¶ 7          On March 24, 2023, the trial court entered a dispositional order finding respondent was, for reasons other than financial circumstances alone, unable to care for, protect, train, educate, supervise, or discipline R.C. and that placement with her was contrary to R.C.'s health, safety, and best interest. The court made R.C. a ward of the court and granted custody and guardianship to DCFS. No transcript of the dispositional hearing appears in the record, but a docket entry states that respondent failed to appear and that the dispositional order was entered

over her attorney's objection.

¶ 8　　　　On March 21, 2025, the State filed a motion for termination of parental rights. The motion alleged that respondent was unfit pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)) in that she failed to make reasonable progress toward R.C.'s return during the nine-month period from February 29, 2024, to November 30, 2024. The motion further alleged that termination of respondent's parental rights was in R.C.'s best interest.

¶ 9　　　　On July 11, 2025, the trial court held a hearing on the issue of unfitness. Respondent testified that she was aware that she had a service plan for the case and she knew what tasks were on the service plan. She indicated that the tasks of obtaining stable housing and cooperating with DCFS were part of her service plan. She stated that her caseworker, Kayla Rhoades, had not inspected her residence. She indicated her residence was available for inspection, but Rhoades canceled three scheduled inspections. Respondent stated she canceled one scheduled inspection. Respondent stated she was incarcerated during the relevant time period, beginning on November 27, 2024. Respondent testified that she had been told to complete parenting classes as part of her service plan, but she was unsuccessfully discharged twice during the relevant time period. Her second discharge from parenting classes occurred due to her incarceration. She stated she had engaged in substance abuse services and mental health counseling during the relevant time period, but she had to stop due to her incarceration. She stated she completed domestic violence counseling prior to February 2024.

¶ 10　　　　Respondent testified she had positive drug tests in March, April, May, and June 2024, but she disagreed with the test results. She stated she also tested negative on several occasions and missed several drug tests between March 2024 and June 2024.

¶ 11　　　　Respondent testified that she had been taking drug tests for years and, in her

experience, if one tested positive for methamphetamine, she would also test positive for amphetamines. It was "alarming" to her that she tested positive for methamphetamine but not amphetamines on many of the tests and that some of her positive rapid screen tests came back as negative after they were sent for laboratory testing. She stated that something was "off" with the testing. She stated she asked her medical providers what could be causing her to test positive for methamphetamine but not amphetamines, but they did not give her any answers. Respondent stated that only one of her prescription medications "would cause anything," but that particular medication was "not even showing up on *** the tests."

¶ 12 Rhoades testified that she was the caseworker assigned to R.C.'s case. She stated that respondent was incarcerated during the relevant time period, starting in November 2024. Respondent had a service plan, which included participating in mental health services, substance abuse services, domestic violence services, parenting classes, visitation, and cooperation with DCFS, and obtaining housing and employment.

¶ 13 Rhoades testified that respondent completed domestic violence classes in January 2024. Rhoades stated she never received documentation showing that respondent completed parenting classes. Rhoades indicated that respondent had been receiving mental health services and substance abuse services, but services were suspended for an extended period of time when respondent was incarcerated in November 2024. Rhoades stated that respondent regularly visited R.C. during the relevant time period and the visits went well. Rhoades indicated that respondent was not employed consistently during the relevant time period. Rhoades testified that she tried to set up visitation at respondent's residence, but respondent repeatedly told her that the house was not ready. Rhoades had to cancel a visit to respondent's residence on one occasion.

¶ 14 Rhoades stated that respondent was supposed to complete four random drug drops

per month. Rhoades stated that, during the relevant time period, respondent missed more than 10 drug drops. She tested negative approximately 10 times, and she tested positive approximately 9 times. Rhoades stated that some of respondent's positive drug tests were sent to laboratories for confirmation testing because respondent believed one of her prescription medications was causing the tests to be positive. Rhoades stated that, on some occasions, respondent tested positive for methamphetamine on the rapid screen drug test but subsequently received a negative result from a laboratory. The trial court admitted into evidence, at the State's request, a copy of drug testing results from April 15, 2024, which showed that respondent tested positive for methamphetamine, and this result was later confirmed by laboratory testing.

¶ 15　　　　On July 15, 2025, the trial court entered a written decision finding the State had met its burden of proving by clear and convincing evidence that respondent was unfit due to her failure to make reasonable progress during the nine-month period from February 29, 2024, through November 30, 2024. Regarding drug testing, the court stated:

> "A considerable amount of testimony was presented on the issue of drug tests. While the parties dispute some aspects of this issue, the undisputed evidence is that: (1) [Respondent] tested positive on some tests, negative on others; (2) She appeared for some drug tests and failed to appear for others; (3) Some initial tests were sent off the lab for confirmation and others were not; and (4) Some lab results confirmed the initial test and others did not."

The court found that respondent made some progress regarding certain aspects of the service plan, but she was sentenced to imprisonment in November 2024 and continued to struggle with substance abuse issues throughout the nine-month period. The court stated that, as of November 30, 2024, respondent had not substantially fulfilled her obligations under the service plan or

corrected the conditions that brought R.C. into care.

¶ 16        On November 17, 2025, the trial court held a best interest hearing. The next day, the court entered a written decision finding termination of respondent's parental rights was in R.C.'s best interest and granting the State's motion for termination of respondent's parental rights. The court subsequently filed an order terminating respondent's parental rights and appointing DCFS as guardian, with the power to consent to adoption of the minor.

¶ 17        This appeal followed.

¶ 18                              II. ANALYSIS

¶ 19        On appeal, respondent argues that the trial court erred by (1) "granting the State's Motion for Default Adjudication based upon an unverified Petition for Adjudication of Wardship," (2) denying respondent's motion to vacate the adjudication, (3) failing to provide respondent with admonishments following the adjudicatory and dispositional hearings that she must cooperate with DCFS and the terms of the service plan and correct the conditions that required the minor to be in care or risk the termination of her parental rights, and (4) finding respondent was unfit.

¶ 20              A. Issues Concerning the Adjudication of Neglect

¶ 21        The first two issues raised by respondent—*i.e.*, that the trial court erred by granting the State's motion for a default adjudication and denying her motion to vacate the adjudication—involve respondent's requests to vacate the adjudicatory order entered on November 21, 2022. However, the subsequent dispositional order entered March 24, 2023, was a final, appealable order. *In re Leona W.*, 228 Ill. 2d 439, 456 (2008). Appealing the dispositional order would have been the proper method for challenging the adjudicatory order. *Id.* However, respondent did not appeal from the dispositional order, and the time for filing such an appeal

lapsed 30 days after the order was entered. *Id.* at 456-57; Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). Accordingly, we lack jurisdiction to review the adjudicatory and dispositional orders in this appeal. *Leona W.*, 228 Ill. 2d at 457.

¶ 22                                B. Failure to Give Admonishments

¶ 23         Respondent argues that the trial court erred by failing to admonish her after the adjudicatory and dispositional hearings that she was required to cooperate with DCFS, comply with the terms of the service plan, and correct the conditions that brought the minor into care or risk termination of her parental rights. Respondent notes that the court was required to give these admonishments pursuant to sections 2-21(1) and 2-22(6)(a) of the Juvenile Court Act (705 ILCS 405/2-21(1), 2-22(6)(a) (West 2022)). She acknowledges that the admonishments were contained in the written adjudicatory and dispositional orders, but she contends that the circuit clerk failed to mail notice of these orders to her correct address. Respondent argues: "Any actions which followed the Adjudicatory hearing and negatively affected [respondent's] rights to custody with her child should be set aside by this Court since she had not received the proper admonishments at the time the Orders which jeopardized her rights to custody of her child were entered."

¶ 24         To the extent respondent is arguing that we should reconsider the adjudicatory or dispositional orders due to the trial court's failure to give these admonishments, we lack jurisdiction to do so. See *Leona W.*, 228 Ill. 2d at 456-57.

¶ 25         To the extent respondent is arguing that the alleged lack of admonishments provide a basis for vacating the termination order, we reject her argument. First, as no transcripts of the adjudicatory and dispositional hearings are contained in the record, it is impossible to determine whether the trial court gave the admonishments at those hearings. Respondent, as the appellant, has the burden of presenting a sufficiently complete record to support her claims of

- 7 -

error, and any doubts arising from the incompleteness of the record are resolved against her. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Even if the court had orally provided these admonishments at the adjudicatory and dispositional hearings, respondent failed to appear at either hearing, a point she does not address in her brief.

¶ 26 Moreover, the record does not definitively establish that the notices of the adjudicatory and dispositional orders were mailed to respondent at the wrong address or that she did not receive them. Respondent notes that the record shows that a dispositional report was filed in December 2022 which contained an address for respondent that was different from the one to which the notices were sent. She also notes that correspondence from the circuit clerk sent to the address where the notices were sent was returned as undeliverable and unable to forward on several occasions. However, the first correspondence that was returned to the circuit clerk as undeliverable was mailed in July 2023, several months after the adjudicatory and dispositional orders were entered and notices were sent to respondent. The record does not establish whether respondent received correspondence sent by the clerk prior to July 2023. See *id.* at 392 ("Any doubts which may arise from the incompleteness of the record will be resolved against the appellant.").

¶ 27 In addition to providing an insufficient record, respondent has provided no argument as to why the alleged lack of admonishments should result in vacatur of the termination order. Typically, when a statute directs the trial court to take some action but fails to specify any particular consequence for its failure to do so, the statute is given a directory rather than mandatory interpretation. *In re M.I.*, 2013 IL 113776, ¶ 16. If a statute is directory, the court's failure to comply with the statutory requirement does not have the effect of invalidating the governmental action to which the procedural requirement relates, and no specific

consequence flows from the lack of compliance. *Id.* The presumption that a statute is directory rather than mandatory may be overcome "(1) when there is negative language prohibiting further action in the case of noncompliance or (2) when the right the provision is designed to protect would generally be injured under a directory reading." *Id.* ¶ 17.

¶ 28        In her brief, respondent does not argue that the statutes at issue are mandatory rather than directory or that either of the two foregoing conditions apply, and we decline to construct such an argument for her. See *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993) ("A reviewing court *** is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error."). Accordingly, we find respondent has forfeited any argument that the statutory sections in question are mandatory rather than directory. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Moreover, she has not otherwise shown that the alleged failure to give the admonishments required the termination order to be vacated.

¶ 29                                C. Unfitness

¶ 30        Respondent argues that the trial court erred by finding that she was unfit due to her failure to make reasonable progress toward R.C.'s return during the nine-month period from February 29, 2024, to November 30, 2024. Respondent contends that she substantially fulfilled her obligations under the service plan because she "correct[ed] a substantial amount of tasks contained in her service plan." Respondent contends that the court erred by determining that some of her drug tests were positive. Respondent asserts: "There were some positive rapid screen

tests, but the caseworker also testified that [respondent] was on medications and that she was aware that there are some medications which can skew a rapid screen drug test result."

¶ 31    In Illinois, the authority to involuntarily terminate parental rights is found in the Juvenile Court Act and the Adoption Act. See *In re J.L.*, 236 Ill. 2d 329, 337 (2010). The Juvenile Court Act sets forth a two-step process for the involuntary termination of parental rights. *Id.* First, the trial court must find by clear and convincing evidence that the parent is an unfit person, as defined in section 1 of the Adoption Act (750 ILCS 50/1 (West 2024)). *J.L.*, 236 Ill. 2d at 337. Second, if the court determines the parent is unfit, the court determines whether termination of parental rights is in the best interest of the child. *Id.* at 337-38.

¶ 32    Pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)), one of the statutory grounds for finding that a parent is unfit to have a child is the parent's failure "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." That section further provides:

"If a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication." *Id.*

¶ 33    Our supreme court has held:

"[T]he benchmark for measuring a parent's 'progress toward the return of the

- 10 -

child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

Reasonable progress is assessed under an objective standard, and it "exists when a parent's compliance with the service plan and the trial court's directives is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original and internal quotation marks omitted.) *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 65.

¶ 34　　　　Because the trial court's opportunity to view and evaluate the parties is superior to that of the appellate court, we will not reverse a finding of unfitness unless it is against the manifest weight of the evidence. *In re M.I.*, 2016 IL 120232, ¶ 21. A trial court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 35　　　　Here, the trial court's determination that the State proved by clear and convincing evidence that respondent was unfit based on her failure to make reasonable progress during the relevant time period was not against the manifest weight of the evidence. R.C. was taken into care due to respondent's drug use, and the evidence at the unfitness hearing showed that respondent continued to use drugs during the relevant nine-month period. Rhoades testified that respondent had positive drug tests approximately nine times during the relevant time period and she missed several drug tests. While respondent presented evidence that some rapid tests were

positive but were later shown to be negative when a laboratory test was performed, the State presented evidence that at least one drug test during the relevant time period was confirmed as positive by a laboratory test. While respondent testified that she was taking prescription medications, she stated that only one of her medications could have affected the test results and that particular medication was "not even showing up on *** the tests."

¶ 36    We conclude that, based on the evidence presented, the trial court's finding that respondent had some positive drug tests during the relevant time period was not against the manifest weight of the evidence. See *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000) ("We *** defer to the trial court's factual findings, and we will not reverse the trial court unless the record shows that the factual findings are against the manifest weight of the evidence."). While respondent's continued drug use was the most significant factor in determining her unfitness, we note that she was incarcerated near the end of the relevant time period, which impeded her progress in parenting classes and mental health and substance abuse counseling. While the evidence showed that respondent made progress on some of the services she was required to complete under the service plan, we find the trial court properly concluded that respondent failed to make reasonable progress toward R.C.'s return during the relevant time period.

¶ 37                                  III. CONCLUSION

¶ 38    For the reasons stated, we affirm the trial court's judgment.

¶ 39    Affirmed.