NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260222-U

NO. 4-26-0222

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 12, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* R.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 24JA108 |
| v. | ) | |
| Kaylenna M., | ) | Honorable |
| Respondent-Appellant). | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Knecht and Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*: Respondent mother failed to establish that the trial court erred in finding her unfit and terminating her parental rights.

¶ 2     Respondent, Kaylenna M., appeals the trial court's termination of her parental rights to her minor child. She argues the court erred in finding her unfit. We affirm.

¶ 3                              I. BACKGROUND

¶ 4     Respondent is the mother of R.M., born in July 2024. Shortly following R.M.'s birth, the State filed a petition for adjudication of wardship, asserting R.M. was a neglected and dependent minor pursuant to sections 2-3(1)(b) and 2-4(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b), 2-4(1)(b) (West 2024)). Specifically, it alleged R.M. was neglected in that his environment was injurious to his welfare because his siblings had been adjudicated neglected, respondent failed to make reasonable progress toward the siblings'

return to her care, and the siblings were in the custody and guardianship of the Illinois Department of Children and Family Services (DCFS). The State alleged that R.M. was a dependent minor because he was without proper care due to respondent's mental disability.

¶ 5 In September 2024, the trial court entered an adjudicatory order, finding R.M. was neglected as alleged by the State. The following month, the court entered its dispositional order, adjudicating R.M. a ward of the court and placing him in DCFS's custody and guardianship.

¶ 6 In July 2025, the State filed a motion to terminate respondent's parental rights to R.M. It alleged she was an unfit parent in that she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to R.M.'s welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) abandoned R.M. (*id.* § 1(D)(a)); (3) deserted R.M. for more than three months before the commencement of termination proceedings (*id.* § 1(D)(c)); (4) failed to make reasonable efforts to correct the conditions which were the basis for R.M.'s removal from her care from September 18, 2024, to June 18, 2025 (*id.* § 1(D)(m)(i)); (5) failed to make reasonable progress toward R.M.'s return to her care from September 18, 2024, to June 18, 2025 (*id.* § 1(D)(m)(ii)); (6) evidenced her intent to forgo her parental rights by failing, for 12 months, to visit R.M., communicate with R.M. or DCFS, or maintain contact with R.M. or plan for his future (*id.* § 1(D)(n)(1)(i)-(iii)); and (7) lacked the ability to discharge her parental responsibilities due to a mental illness, mental impairment, or intellectual disability that would extend beyond a reasonable time period (*id.* § 1(D)(p)). The State further alleged termination of respondent's parental rights was in R.M.'s best interest. (The record shows that during the underlying proceedings, the State also sought to terminate the parental rights of any putative and unknown fathers of R.M., and the trial court granted the State's request. However, this appeal concerns only the termination of respondent's parental rights, and we discuss the issues solely as they relate to her.)

¶ 7        In January 2026, the trial court conducted a fitness hearing. The State presented testimony from Danielle Croll, a case manager with the Family Service Center and R.M.'s caseworker. Croll testified R.M. was removed from respondent's care because respondent had "a current open DCFS case that she had not completed her services on." Croll indicated that respondent had developmental delays and that respondent's mother, Jacqueline M., acted as respondent's adult guardian. Jacqueline reported to Croll that respondent "had several delays," including autism and microcephaly.

¶ 8        The first of respondent's service plans that involved R.M. covered August 2024 to February 2025. Respondent was required to cooperate "with the agency," receive parenting coaching, attend visitations with R.M., and undergo a psychological assessment. Croll stated she discussed with respondent what she needed to do to complete each of the tasks in her service plan. Croll also made the necessary referrals so that respondent could engage in services. Nevertheless, respondent "didn't cooperate." Additional service plans were established in February 2025 and August 2025, but respondent failed to cooperate and did not complete the required services.

¶ 9        Croll testified that from the time of R.M.'s birth in July 2024 until December 2024, she had regular contact with respondent. However, after January 2025, respondent was uncooperative. After February 2025, Croll had no contact with respondent until December 2025, when respondent gave birth to another baby.

¶ 10       Croll testified that, in 2022, respondent was originally referred for parenting services in connection with the case involving her older children. Respondent completed parenting coaching, and a determination was made that she "could probably parent with the help of someone else." In November 2024 and February 2025, respondent received referrals for additional parenting services but was "dropped" both times "for failure to engage." Also, in March 2023, respondent

underwent a psychological evaluation. However, the evaluation was incomplete because respondent could not answer all the questions without assistance. Later, a court order was obtained for an additional psychological evaluation. That evaluation was scheduled for March 2025 but was never completed by respondent.

¶ 11     With respect to visitation, respondent was offered two two-hour visits with R.M. per week. The visits were always held at the Family Service Center and supervised by its staff. Croll stated that until December 2024, respondent attended her visits with R.M. "pretty regularly." During visits, respondent required assistance from Jacqueline, who would help with feeding and changing R.M.

¶ 12     In December 2024, Jacqueline began "having some issues" and was admitted to a mental health facility. Beginning in January 2025, case aides were sent to respondent's residence to pick her up and take her to visitations. Croll stated there were several times that respondent refused to answer the door and that, sometimes, respondent provided the excuse that she was sick. According to Croll, respondent knew when her visits with R.M. were every week and what time a case aide would arrive to pick her up. At some point, respondent's residence "had an eviction notice on it" and, around February or March 2025, respondent left the residence. It was Croll's understanding that after being evicted, respondent was either homeless or living with different people. In February 2025, respondent's visits with R.M. were suspended due to her "not showing" and Croll's inability to contact her. Croll stated that respondent "missed all visits [with R.M.] from February 2025 to present."

¶ 13     Croll testified that after losing contact with respondent, she texted respondent's phone numbers that were "on file." She also texted respondent's paramour. However, respondent never responded to the text messages and, eventually, the phone numbers stopped working. Croll

further "submitted diligent searches" for respondent, which "kept coming up to the address that [respondent] was evicted from." In December 2025, respondent gave birth to another child, and Croll visited her in the hospital. She stated she spoke with respondent about the new baby, but respondent "didn't really ask any questions about [R.M.]"

¶ 14    Croll agreed that respondent became uncooperative around the time Jacqueline was institutionalized and that, prior to that time, Jacqueline helped to facilitate interactions between Croll and respondent. After December 2024, Croll had no contact with Jacqueline. She unsuccessfully tried to reach out to Jacqueline by contacting the facility she was in and contacting Jacqueline's mother. However, Jacqueline was not willing to speak with Croll, and Croll believed Jacqueline was not "in her right mind to be able to do that." Around the same time Croll lost contact with Jacqueline, she discussed with respondent the possibility of obtaining an alternate guardian. Respondent suggested her paramour, who Croll stated "also ha[d] some developmental delays." In February or March 2025, Croll contacted Adult Protective Services regarding respondent. She later learned that respondent "wouldn't talk to them." Croll testified that respondent had "no other family supports" to act as her guardian.

¶ 15    Croll asserted that she was never close to returning R.M. to respondent's care and pointed out that respondent "had not completed any of her services." She also stated that she did not believe that R.M. could have been returned to respondent even if Jacqueline had been available to help, stating that respondent was also unsuccessful at having her older children returned to her care.

¶ 16    Respondent testified on her own behalf at the fitness hearing. She stated that she agreed with Croll's testimony regarding what had occurred "[f]or the most part." Respondent asserted she successfully completed parenting coaching but could not remember if she was asked

to take parenting classes. She also stated that she underwent one psychological evaluation and "was not aware of the second one."

¶ 17    Respondent acknowledged that she had not visited with R.M. since February 2025. She explained that she lost Croll's contact information after "going to the hospital for appointments and treatments." She could not remember if Croll ever reached out to her during that time and stated that she also believed that she was denied visitation at some point. Respondent stated she was not aware of Croll sending people to facilitate visitation for her and denied that she deliberately refused to answer the door or communicate with anyone. Respondent maintained that she still wanted to have visits with R.M. She asserted that she asked to reengage in visits and was told "they would discuss it." However, no one got back to her, and she had not "recently" reached out to Croll regarding visits with R.M.

¶ 18    Respondent testified that her adult guardian Jacqueline previously assisted her with her services and facilitated her visits with R.M. Jacqueline being unavailable to assist her interfered with her ability to engage in services. Respondent admitted that she did not take any steps on her own to reach out to Croll, participate in services, or reinstitute visits with R.M. However, she asserted she was willing to engage in services. Respondent also acknowledged that she did not currently have a "fixed residence" but stated that she and her paramour were "working to get a place."

¶ 19    The trial court determined respondent was unfit based upon five of the seven unfitness grounds alleged by the State. Specifically, it determined that respondent (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to R.M.'s welfare; (2) abandoned R.M.; (3) deserted R.M.; (4) failed to make reasonable efforts to correct the conditions that were the basis for R.M.'s removal from her care from September 2024 to June

2025; and (5) failed to make reasonable progress toward R.M.'s return to her care during that same period.

¶ 20 Immediately following the fitness hearing, the trial court conducted the best interest hearing. Again, both Croll and respondent testified at the hearing. The evidence showed R.M. was one and a half years old. He had been in the same traditional foster home since birth, and the home was an adoptive placement. During her testimony, respondent continued to express a desire to have visits with R.M. She also expressed a willingness to engage in services. Ultimately, the court found that termination of respondent's parental rights was in R.M.'s best interest.

¶ 21 This appeal followed.

¶ 22 II. ANALYSIS

¶ 23 On appeal, respondent argues the trial court erred in finding that she was an unfit parent. She contends the court's findings were against the manifest weight of the evidence when considering her efforts and unique circumstances.

¶ 24 The Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)) provides for the involuntarily termination of parental rights where the trial court finds, by clear and convincing evidence, that a parent is unfit based on grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) and that termination is in the minor's best interest. *In re M.I.*, 2016 IL 120232, ¶ 20. "Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed 'unfit,' any one ground, properly proven, is sufficient to enter a finding of unfitness." *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). On review, a trial court's finding that a parent is unfit will not be disturbed unless the finding is against the manifest weight of the evidence. *M.I.*, 2016 IL 120232 ¶ 21. A court's decision "is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." (Internal quotation marks

omitted.) *Id.*

¶ 25 Here, the State alleged respondent was unfit based upon seven separate grounds set forth in the Adoption Act. Following the fitness hearing, the trial court found that respondent was unfit based upon five of those seven grounds. Specifically, the court determined that respondent (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to R.M.'s welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) abandoned R.M. (*id.* § 1(D)(a)); (3) deserted R.M. for more than three months preceding the commencement of termination proceedings (*id.* § 1(D)(c)); (4)failed to make reasonable efforts to correct the conditions that were the basis for R.M.'s removal from her care during the nine-month period extending from September 2024 to June 2025 (*id.* § 1(D)(m)(i)); and (5) failed to make reasonable progress toward R.M.'s return to her care during that same nine-month period (*id.* § 1(D)(m)(ii)).

¶ 26 Significantly, on appeal, respondent addresses only three of the five grounds upon which the trial court found her unfit, presenting no argument or analysis with respect to the grounds of abandonment or desertion (*id.* § 1(D)(a), (c)). We note that the argument section of an appellant's brief must "contain the contentions of the appellant and the reasons therefor" and that "[p]oints not argued are forfeited." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Further, as stated, a trial court's unfitness finding may be supported by only a single ground which is properly proven. *Donald A.G.*, 221 Ill. 2d at 244. A parent's failure to challenge every ground upon which the court determined him or her unfit effectively concedes that the parent was unfit based upon the unchallenged grounds. See *In re D.L.*, 326 Ill. App. 3d 262, 268 (2001) (finding that the respondent parents' failure to challenge one ground upon which the trial court determined that they were unfit amounted to a concession that they were unfit on that unchallenged ground).

¶ 27 Here, respondent has forfeited any argument that the trial court erred in finding that

she was unfit for abandoning or deserting R.M. by failing to present any reasoned analysis as to either of those grounds in her appellant's brief. Her failure to challenge the court's findings that she was unfit on those grounds amounts to a concession that she was unfit on those bases.

¶ 28     However, even setting aside respondent's forfeiture and her concession to the unchallenged grounds, we would find the evidence supports the trial court's findings that she was unfit based on the grounds respondent does challenge on appeal. In particular, the evidence sufficiently demonstrated that respondent was unfit for "[f]ail[ing] to maintain a reasonable degree of interest, concern, or responsibility as to [R.M.'s] welfare" under section 1(D)(b) of the Adoption Act.

¶ 29     "Because the language of section 1(D)(b) is in the disjunctive, any of the three elements may be considered on its own as a ground for unfitness." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). When considering whether a parent is unfit under that section, "a trial court must (1) focus on a parent's reasonable efforts, not his success, and (2) consider any circumstances that may have hindered his ability to visit, communicate with, or otherwise show interest in his child." *Id.* "[A] parent is not fit merely because she has demonstrated some interest or affection towards her child." (Internal quotation marks omitted.) *Id.* Instead, "a parent's interest, concern, or responsibility must be reasonable." *Id.* "Noncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under [section 1(D)(b)]." *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004).

¶ 30     In this case, the evidence showed respondent was noncompliant with the service plans that were established following R.M.'s removal from her care. She was referred for parenting services in November 2024 and February 2025 but was "dropped" on both occasions "for failure

to engage." She also failed to complete a psychological evaluation that was scheduled to occur in March 2025. In February 2025, respondent stopped communicating with Croll entirely, and she attended no visits with R.M. from that time through the date of the January 2026 fitness hearing. Evidence indicated that Croll was able to reestablish contact with respondent in December 2025, after respondent gave birth to another child. When Croll visited respondent in the hospital, respondent "didn't really ask any questions about [R.M.]"

¶ 31 On appeal, respondent contends her lack of engagement and participation in the case was due to the unavailability of her adult guardian, beginning in December 2024. The record shows that the trial court considered such circumstances but noted that efforts were made by Croll and others after that time to maintain contact with respondent and to facilitate her visits with R.M. In particular, case aides went to respondent's residence to take her to visits. Respondent did not answer the door or provided excuses for not attending visits. After respondent was evicted from her residence, Croll texted respondent and her paramour without receiving a response and unsuccessfully conducted "diligent searches" for respondent. The court also pointed out that respondent's visits with R.M. had always occurred at the same location, the Family Service Center. The court concluded that respondent had "some responsibility" to go to that location if she could not reach Croll and stated as follows: "[Respondent] said that she was going to therapies or treatments, so she got other places. She[,] at the most basic level[,] needed to get to the Family Service Center to re-establish contact."

¶ 32 Here, the trial court's findings were supported by the record, and the evidence was sufficient to establish that respondent was unfit. An opposite conclusion from the one reached by the court is not clearly apparent, and the court's decision was not against the manifest weight of the evidence.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.